[No. G030347. Fourth Dist., Div. Three. Mar. 14, 2006.]

ROBERT A. JONES, as Acting Labor Commissioner, etc., et al., Plaintiffs and Respondents, v.
WILLIAM S. GREGORY, Defendant and Appellant.

## COUNSEL

Law Offices of Marla Merhab Robinson, John R. Marshall III and Cosmo A. Taormina for Defendant and Appellant.

Division of Labor Standards Enforcement, Miles E. Locker and Johanna Y. Hsu for Plaintiffs and Respondents.

William G. Hoerger for California Rural Legal Assistance as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**ARONSON, J.**—William S. Gregory appeals from a judgment holding him individually liable for his corporation's "delinquencies in paying [outstanding wages, expenses, interest and penalties], not because he 'did business as' . . . or through any veil-piercing analysis, but simply because he was a 'corporate officer who had operational control of the corporation's covered enterprise,' " quoting *Lopez v. Silverman* (S.D.N.Y 1998) 14 F.Supp.2d 405, 412–413. The Labor Commissioner, by the Division of Labor Standards Enforcement (DLSE), brought this suit against Gregory on behalf of the corporation's unpaid California employees. Relying on assertedly analogous federal authorities, DLSE argued Gregory fell within the meaning of "employer" in various Labor Code[1] wage provisions and Industrial Welfare Commission (IWC) wage orders. Attacking the judgment, Gregory contends California law does not support imposing personal liability on corporate officers or agents as "employers." Guided by our Supreme Court's recent decision in *Reynolds v. Bement* (2005) 36 Cal.4th 1075 [32 Cal.Rptr.3d 483, 116 P.3d 1162] (*Reynolds*), we agree. We therefore reverse the judgment and remand for proceedings consistent with this opinion.

I

## FACTUAL AND PROCEDURAL BACKGROUND

Gregory was the creative force behind "Science Adventures" (SA), a large-scale collection of "hands-on" summer science camps aimed at elementary school children. The first-ever session of SA premiered in 1979, with 60

---

[1] Unlabeled statutory references are to this code.

campers. Some 20 years later, there were more than 40,000 enrollees nationwide, generating in excess of $10 million in revenues.

Gregory's dominance of SA's corporate activities left no doubt about his place in the company's pecking order. Variously known to his employees as the "owner," "the big wig," "the top guy," and "the boss," Gregory was registered as SA's chief executive officer with the California Secretary of State. All remaining corporate positions for SA were held by Gregory's wife, Toni.

Gregory held an ownership interest in a combined warehouse/office building housing SA's main base of operations and was a fixture at the facility. At any time of day, he might be found in virtually any area of the building.

In the wake of the company's dramatic growth, Gregory personally hired and assembled a team of seven lead staff members, each assigned to cover a different area of the company. All of these individuals reported directly to Gregory. Gregory set salaries and promotions for the members of this topmost echelon, and supervised their duties as well. He also set the wage rates for all other SA employees, authorized pay changes, and personally fired staff members he deemed unacceptable. Similarly, any ideas for new projects or expansion were directed to Gregory for his consideration and approval. And he was the only individual authorized to sign checks on SA's behalf. As one employee opined, Gregory "was the overall approver [*sic*] for everything. . . . Anything and everything went through Bill." .

Being a seasonal enterprise, SA generated at least 50 percent of its revenue during the summer months. Put another way, SA's three-month summer program brought in "lots of cash flow on a regular basis." During the school year, however, the cash flow thinned out, so SA planned enrollment and staffing needs accordingly.

Near the end of summer 1999, SA ran into an unexpected glitch. Cash on hand ran low even though the program had produced some $10 million in gross receipts. By the time the dust settled, some 555 summer instructors and 147 administrators were left with wages due and unpaid. Gregory claimed to have no prior knowledge of the shortfall and identified the unauthorized release of some $300,000 in checks as at least a partial cause of the problem.

In a series of signed memos to all SA employees, Gregory recounted the company's funding status and its inability to pay wages. With each memo, the prospects turned progressively more bleak, with Gregory ultimately announcing a "priority" wage repayment scheme: "[W]e have begun paying those instructors who have returned to work first. They will be helping

generate the cash which will eventually pay everyone else. . . . [¶] . . . [¶] We now propose to pay any unpaid summer instructors who are not currently working, but who choose to return to teach summer camp 2000 in three payments. The first will be equal to approximately 25% of what is owed . . . . The second payment . . . will be paid whenever the instructor shows up for training. The balance will be made at the end of the summer season. . . . [¶] . . . [¶] Although all employees who have not been paid . . . certainly have the right to seek legal action, they will be placed in last priority . . . ." He invited any employee who would agree to settle their claim for 75 percent of the total sum owed to complete an attached release form.

According to Gregory, he relinquished control of SA to an investment group in November 1999. He continued to work for that group, Science Enrichment Services, until it filed for bankruptcy in October 2000. SA continues in operation as an ongoing concern and Gregory serves as its chief executive officer.

In August 2000, DLSE sued Gregory, SA (by then a suspended California corporation), and another entity, Community Achievement Services, Inc. (CAS), to recover wages owed to 45 former California employees. CAS filed for bankruptcy before trial.

DLSE's complaint sought an accounting and alleged the following causes of action: (1) failure to pay wages immediately upon discharge, layoff, or resignation (§§ 201–203); (2) failure to pay vested vacation time (§ 227.3); (3) failure to indemnify business expenses (§ 2802); and (4) money had and received. The complaint also sought to enjoin the defendants pursuant to section 1194.5 "from engaging in any further and future violations of the labor laws, regulations and orders, specifically, Labor Code sections 201, 202, 203, and 227.3." DLSE alleged "[e]ach of the Defendants was a joint employer of the employees, and an agent and/or alter ego of the other defendants . . . ."

The matter went to trial in a bifurcated proceeding, with the court eventually entering judgment in favor of 14 employees who testified at trial. The judgment, entered jointly and severally against SA and Gregory, totaled $100,248.64 for unpaid wages, unpaid vacation time, business expenses, interest, and waiting time penalties. This appeal followed.

## II

## DISCUSSION

A. Reynolds *Rejected Plaintiffs' Argument That an Employer with Operational Control of a Corporation Is Liable for Employee Wages*

Gregory argues the trial court erred in looking to *Lopez*'s "operational control" standard to impose personal liability on a corporate officer for unpaid employee wages. The Fair Labor Standards Act (FLSA) defines "employer" broadly.[2] Holding a corporation's president liable for his employees' unpaid overtime wages, *Lopez* observed "[n]umerous [federal circuits] have concluded that an individual corporate officer or owner may be deemed an employer under the FLSA—and therefore responsible for the corporation's FLSA obligations—in situations where the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions." (*Lopez v. Silverman, supra,* 14 F.Supp.2d at p. 412.)

Unlike the FLSA, the Labor Code supplies no uniform definition, broad or narrow, for "employer," although some provisions define the term in a manner expressly limited to the particular section. (See, e.g., §§ 233, subd. (b)(2) [sick leave requirement, providing that, "As used in this section," employer "means any person employing another under any appointment or contract of hire and includes the state, political subdivisions of the state, and municipalities"], 350, subd. (a) ["As used in this article [concerning gratuities]," employer "means every person engaged in any business or enterprise in this state that has one or more persons in service under any appointment, contract of hire, or apprenticeship, express or implied, oral or written, irrespective of whether the person is the owner of the business or is operating on a concessionaire or other basis"].)

Under our Supreme Court's recent decision in *Reynolds, supra,* 36 Cal.4th 1075, federal law provides no mooring for the trial court's decision. In *Reynolds,* an automobile paint shop employee sought overtime wages for himself and putative class members, suing the incorporated paint shop, its president, and other individual defendants under section 1194. That statute provides, in pertinent part: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal

---

[2] " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." (*29 U.S.C. § 203(d).*)

overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." (§ 1194, subd. (a); see also § 510 [defining overtime].)

█ *Reynolds* acknowledged " '[f]ederal decisions have frequently guided our interpretation of state labor provisions the language of which parallels that of federal statutes' [citation]." (*Reynolds, supra,* 36 Cal.4th at p. 1088.) But the high court explained that " 'where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced' [citation]. While the FLSA contains an express definition of 'employer' [citation], section 1194 does not." (*Ibid.,* footnote omitted.) " 'In this circumstance—a statute referring to employees without defining the term—courts have generally applied the common law test of employment.' " (*Id.* at p. 1087.) █ As the court observed, "Under the common law, corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages. [Citations.]" (*Ibid.*)

As with section 1194, so too none of the Labor Code provisions plaintiffs rely upon in their complaint—sections 201, 202, 203, 227.3, 1194.5, or 2802[3]—define "employer." Hence, as *Reynolds* explained, the FLSA, *Lopez,* and other federal authority plaintiffs extensively cited are simply beside the point. And the presumption is that the common law definition of an employer applies, precluding personal liability for corporate agents.

*Reynolds* is instructive in another respect. The IWC "is the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561 [59 Cal.Rptr.2d 186, 927 P.2d 296].) In *Reynolds,* the plaintiff relied on a wage order affecting transportation businesses, Wage Order No. 9, which defines "employer" to include an

---

[3] These provisions, except for section 1194.5 which we discuss below, state, in relevant part: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." (§ 201, subd. (a).) "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter . . . ." (§ 202, subd. (a).) "If an employer willfully fails to pay, without abatement or reduction, . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefore is commenced; but the wages shall not continue for more than 30 days." (§ 203.) "[W]henever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate . . . ." (§ 227.3.) "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." (§ 2802, subd. (a).)

individual who "exercises control over the wages, hours, or working conditions of any person."[4] Plaintiffs rely on an identical definition of "employer" in the wage order applicable here.[5]

■ But as the Supreme Court noted, the "plain language" of the IWC employer definition "does not expressly impose liability under section 1194 on individual corporate agents. Nor can we infer that the Legislature, simply by amending sections 510 and 1194 several times after the IWC adopted its employer definition, impliedly intended to incorporate that definition . . . ." (*Reynolds, supra,* 36 Cal.4th at p. 1086.) Notably, "[n]either section 510 nor section 1194 contains any reference to the IWC employer definition . . . ." (*Id.* at p. 1087.) *Reynolds* explained that "[a] statute will be construed in light of the common law unless the Legislature ' " 'clearly and unequivocally' " ' indicates otherwise" and therefore, "had the Legislature intended to depart from the common law by engrafting Wage Order No. 9 onto section 1194, it would have more clearly manifested that intent." (*Id.* at pp. 1086–1087.) Similarly here, none of the provisions plaintiffs rely upon refer to the IWC employer definition; hence, there is no reason to suppose the Legislature intended to alter the common law's rule against personal liability for corporate agents.

### B. DLSE-prosecuted Actions: Plaintiffs' Attempt to Distinguish Reynolds Fails

Plaintiffs attempt to distinguish *Reynolds* because the plaintiff there sued in his private capacity, whereas DLSE has prosecuted this action. There is some, albeit limited, support for this distinction in *Reynolds* itself. (See *Reynolds, supra,* 36 Cal.4th at p. 1088 ["we have no occasion in resolving this private dispute to address questions concerning the DLSE's use, *in administrative proceedings,* of the IWC employer definition," italics added]; see *id.* at pp. 1084–1085 [explaining that an employee may seek " '*administrative* relief by filing a wage claim with the commissioner . . . commonly known as the "Berman" hearing procedure, after the name of its sponsor' "; see generally § 98 et seq. [Berman hearings]; Cal. Code Regs., tit. 8, § 13052 [hearing

---

[4] In its entirety, the IWC employer definition reads: " 'Employer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11090, subd. 2(F).) Section 18 provides: " 'Person' means any person, association, organization, partnership, business trust, limited liability company, or corporation."

[5] Plaintiffs, oddly, cite Wage Order No. 1, which covers the manufacturing industry (see Cal. Code Regs., tit. 8, § 11010, subd. 2(F)), but the correct citation should probably be Wage Order No. 4, applicable to "Professional, Technical, Clerical, Mechanical and Similar Occupations." (See Cal. Code Regs., tit. 8, § 11040, subd. 2(H).) In any event, the definition of "employer" is identical in each wage order.

procedures].) Plainly, the distinction evaporates insofar as DLSE filed this action in court rather than before an administrator.

The distinction, moreover, may be an empty one, since Berman hearings are reviewed de novo in superior court at request of either party. (§ 98.2.) Additionally, even in the administrative context, "the DLSE in its adjudicatory role . . . is of course obligated to follow the substantive law" and, as the Supreme Court observed, "nothing in that process precludes hearing officers from finding individual corporate agents liable for unpaid wages *when such liability is proven on established common law [e.g., alter ego] or statutory theories.*" (*Reynolds, supra,* 36 Cal.4th at p. 1089, italics added, fns. omitted, citing § 2673.1 [requires personal guarantee of minimum wage and overtime compensation in garment manufacturing operations].) The Supreme Court did not suggest individual corporate agent liability for unpaid wages may be proven on anything other than established common law or statutory theories. Here, the trial court expressly declined to premise its ruling on the plaintiffs' alter ego theory, and we are not in a position to make such a finding on appeal.[6] As we discuss below, the statutory theories plaintiffs have advanced in post-*Reynolds* briefing do not support the imposition of individual liability.

### 1. *Section 98.3*

Plaintiffs point out that while "[n]either section 510 nor section 1194 contains any reference to the IWC employer definition" (*Reynolds, supra,* 36 Cal.4th at p. 1087), section 98.3, subdivision (b), expressly provides: "The Labor Commissioner may prosecute action[s] for the collection of wages and other moneys payable to employees or to the state arising out of an employment relationship *or order of the Industrial Welfare Commission.*" (Italics added.) A plain reading of this language reveals no intent to make substantive changes to the Labor Code by importing IWC orders in whole or in part. (See *Reynolds, supra,* 36 Cal.4th at p. 1086 ["The best indicator of . . . intent is the language of the provision itself"].) The Supreme Court described the "special statutory scheme codified in sections 98 to 98.8" in procedural terms noting, for example, its provision for administrative relief in Berman hearings (*Reynolds, supra,* 36 Cal.4th at p. 1084). While section 98.3 authorizes the Labor Commissioner to prosecute civil actions in addition to pursuing administrative relief, nothing in section 98.3 purports to modify the substantive terms of the Labor Code.

Moreover, section 98.3 is untethered to any particular statutory wage requirement, so *Reynolds's* observation remains true that the IWC employer

---

[6] Whether the plaintiffs may pursue their alter ego theory is a question best left for the trial court on remand.

definition "does not expressly impose liability under section 1194 [or any other Labor Code provision] on individual corporate agents." (*Reynolds, supra*, 36 Cal.4th at p. 1086.) In other words, if the Legislature had "intended to depart from the common law by engrafting Wage Order No. 9 [or a similar IWC regulation] onto section 1194 [or other statutory provision], it would have more clearly manifested that intent." (*Id.* at p. 1087.) Put simply, section 98.3 does not engraft Wage Order No. 4's "exercises control" language onto the code provisions cited in plaintiffs' complaint.

### 2. Section 1194.5

Plaintiffs next contend section 1194.5 authorizes the DLSE to seek an injunction against "any *person* employing an employee where such *person* has willfully violated any of the laws, regulations, or IWC orders governing wages, hours of work, or working conditions." (Plaintiffs' quotation and italics.) But the statute's terms do not actually embrace "any" person. Rather, only persons "employing" others are subject to injunction and, under common law agency principles long ago codified (Civ. Code, § 2343; see, e.g., *Oppenheimer v. General Cable Corp.* (1956) 143 Cal.App.2d 293, 297 [300 P.2d 151]), a corporate officer or agent does not employ employees—the corporation does.[7] Section 1194.5 evinces no clear and unequivocal intent to depart from these principles. (See *Reynolds, supra*, 36 Cal.4th at p. 1086.) Additionally, the equitable relief contemplated by the statute, "an injunction against any further violations," is prospective, and plaintiffs do not explain how they may invoke the statute to support damages for the past violations identified here.[8]

### 3. Section 240

Plaintiffs argue section 240 furnishes grounds for individual corporate officer or agent liability. According to plaintiffs, section 240 "allow[s] the Labor Commissioner to reach beyond the common law employer for amounts owed under [the Labor Code's wage] article . . . ." Even assuming we were to overlook plaintiffs' failure to raise section 240 below, the statute's terms do not provide for the damages judgment entered here. Instead, *if* a judgment is

---

[7] Section 1194.5 provides: "In any case in which a person *employing* an employee has willfully violated any of the laws, regulations, or orders governing the wages, hours of work, or working conditions of such employee, the division may seek, in a court of competent jurisdiction, and the court may grant, an injunction *against any further violations* of any such laws, regulations, or orders by such person." (Italics added.)

[8] Plaintiffs' complaint predated *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177 [96 Cal.Rptr.2d 518, 999 P.2d 706], where the court concluded an employee may obtain the equitable remedy of restitution under Business and Professions Code section 17200 to recover payment of unlawfully withheld wages. As the issue is not raised, we express no opinion on the merits of such a suit against an individual corporate officer or agent.

entered (or a misdemeanor penalty assessed, as applicable) and remains unsatisfied *and* the employer has waived or exhausted appeal, DLSE may seek a bond "payable to the Labor Commissioner and . . . conditioned that the employer shall, for a definite future period, not exceeding six months, pay the employees in accordance with the provisions of this article, and shall be further conditioned upon the payment by the employer of any judgment which may be recovered against the employer pursuant to the provisions of this article." (§ 240, subd. (a).) The Legislature anticipated employer recalcitrance in posting the bond and therefore provided in subdivision (b) that "a court of competent jurisdiction" may enjoin the employer "from doing business until the requirement is met, and make other and further orders appropriate to compel compliance with the requirement." (*Id.*, subd. (b).)

True, not just the "employer" but "such other person or persons as may have been or may be concerned with or in any way participating in the failure to pay the wages resulting in the conviction or in the judgment" may be enjoined and subject to "other and further" appropriate orders, until the bond is posted. (§ 240, subd. (b).) But the employer is required to post the bond: section 240 nowhere provides that individual officers or agents must do so.[9] The injunctive relief prohibiting individuals from carrying on the employer's business does not suggest the Legislature intended to transmute, ipse dixit, the judgment or conviction previously obtained against the employer, or the bond requirement imposed on the employer, into a damages

---

[9] In full, section 240 provides: "(a) If any employer has been convicted of a violation of any provision of this article, or if any judgment against an employer for nonpayment of wages remains unsatisfied for a period of 10 days after the time to appeal therefrom has expired, and no appeal therefrom is then pending, the Labor Commissioner may require the employer to deposit a bond in such sum as the Labor Commissioner may deem sufficient and adequate in the circumstances, to be approved by the Labor Commissioner. The bond shall be payable to the Labor Commissioner and shall be conditioned that the employer shall, for a definite future period, not exceeding six months, pay the employees in accordance with the provisions of this article, and shall be further conditioned upon the payment by the employer of any judgment which may be recovered against the employer pursuant to the provisions of this article.

"(b) If within 10 days after demand for the bond, which demand may be made by mail, the employer fails to deposit the bond, the Labor Commissioner may bring an action in the name and on behalf of the people of the State of California against the employer in a court of competent jurisdiction to compel the employer to furnish the bond or to cease doing business until the employer has done so. The employer has the burden of proving either that the bond is unnecessary or that the amount demanded is excessive. If the court finds that there is just cause for requiring the bond, and that the bond is reasonably necessary or proper to secure prompt payment of the wages of the employees of the employer and the employer's compliance with the provisions of this article, the court may enjoin the employer, whether an individual, partnership, corporation, company, trust, or association, and such other person or persons as may have been or may be concerned with or in any way participating in the failure to pay the wages resulting in the conviction or in the judgment, from doing business until the requirement is met, and make other and further orders appropriate to compel compliance with the requirement."

award against particular individuals. Due process precludes such an interpretation. (See *Young v. Haines* (1986) 41 Cal.3d 883, 898 [226 Cal.Rptr. 547, 718 P.2d 909] [courts construe legislation in manner avoiding doubts about constitutionality].) And the provision for "other and further" appropriate orders to compel posting of the bond is too vague to conclude the Legislature clearly and unequivocally intended to controvert the common law. (See *Reynolds, supra,* 36 Cal.4th at p. 1086.) In sum, plaintiffs' reliance on section 240 is misplaced.

### 4. *Section 210*

Finally, plaintiffs rely on section 210, a civil penalty provision for missed pay dates.[10] Although the statute makes "every person" liable for failure to meet the prescribed pay dates, it is not clear the Legislature intended this provision to abrogate the common law and impose personal liability on corporate officers or payroll agents, particularly given that the persons the section targets appear to be, not individuals, but "employers" (the penalty proceeds are used in part to educate them about state labor laws). In any event, we need not decide this issue because the statute provides no support for the damages awarded here: not only is the penalty amount as low as $100, it is not recovered for the employees but rather split between the General Fund and the aforementioned employer education fund.[11]

---

[10] Section 210 reads: "In addition to, and entirely independent and apart from, any other penalty provided in this article, every person who fails to pay the wages of each employee as provided in Sections 204, 204b, 204.1, 204.2, 205, 205.5, and 1197.5, shall be subject to a civil penalty as follows: [¶] (a) For any initial violation, one hundred dollars ($100) for each failure to pay each employee. [¶] (b) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld. [¶] The penalty shall be recovered by the Labor Commissioner as part of a hearing held to recover unpaid wages and penalties pursuant to this chapter or in an independent civil action. . . . Twelve and one-half percent of the penalty recovered shall be paid into a fund within the Labor and Workforce Development Agency dedicated to educating employers about state labor laws, and the remainder shall be paid into the State Treasury to the credit of the General Fund."

[11] Section 558, in sharp contrast to section 210, provides for penalties in "an amount sufficient to recover underpaid wages," which shall be "paid to the affected employee." Moreover, section 558 applies to "[a]ny employer or *other person acting on behalf of an employer*," a much stronger indication it applies to corporate officers and agents. (§ 558, subd. (a), italics added.) In its entirety, section 558, subdivision (a), provides: "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty as follows: [¶] (1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. [¶] (2) For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient

### C. *Conclusion: The Labor Code Affords No Redress for Plaintiffs' Claims*

The facts underlying plaintiffs' complaint arose in 1999, before the 2000 effective date of section 558 and before enactment of the Labor Code Private Attorneys General Act of 2004 (§ 2698 et seq.).[12] As Justice Moreno observed in *Reynolds*, section 2699, "in time, may provide workers with a mechanism for recovering unpaid overtime wages through private enforcement of section 558, which authorizes civil penalties for violations of the wage laws that include unpaid wages from '[a]ny employer or other person acting on behalf of an employer,' a phrase conceivably broad enough to include corporate officers and agents in some cases." (*Reynolds, supra,* 36 Cal.4th at p. 1094 (conc. opn. of Moreno, J.).) Justice Moreno cautioned, however, that these provisions are "untested at this point," whereas section 1194, "by contrast, is an established remedy . . . ." (*Reynolds,* at p. 1094.) It may be that Justice Moreno's concerns regarding novel legislation were prompted by the enforcement gap disclosed in an unpublished federal decision concluding section 558 established no private right of action (*Ruiz v. Paladin Group, Inc.* (C.D.Cal., Sept. 29, 2003, No. CV03-6018-GHK (RZH)) 2003 WL 22992077), necessitating further legislative intervention the next year (§ 2699).

In any event, Justice Moreno observed: "Given the Legislature's stated commitment to the enforcement of the state's labor laws, and its willingness to entrust enforcement of those laws, in some cases, to workers themselves, it would make sense for the Legislature to extend the reach of section 1194 to include individuals who are directly responsible for the nonpayment of overtime wages but who hide behind the corporate form. . . . Taking a leaf from federal law, the Legislature could similarly authorize section 1194 actions against such individuals. I urge the Legislature to do so." (*Reynolds, supra,* 36 Cal.4th at pp. 1094–1095.)

As this case demonstrates, more than overtime wages are at stake in what some no doubt view as a considered policy decision and others a Labor Code "lacuna" (*Reynolds, supra,* 36 Cal.4th at p. 1092 (conc. opn. of Moreno, J.)) that shields "corporate officers with significant ownership interest who exercise[] 'operational control of significant aspects of the corporation's day to

---

to recover underpaid wages. [¶] (3) Wages recovered pursuant to this section shall be paid to the affected employee."

[12] See, in particular, section 2699, subdivision (a): "Notwithstanding any other provision of law, any provision of [the Labor Code] that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees . . . may, as an alternative, be [enforced, and the penalty] recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees . . . ."

day functions' including employee compensation and 'who personally ma[k]e decisions to continue operations despite financial adversity' . . . ." (*Id.* at p. 1095, quoting *Donovan v. Agnew* (1st Cir. 1983) 712 F.2d 1509, 1514.) A few months removed from *Reynolds*, it remains for the Legislature to decide whether to extend the reach of section 1194.

### III

### DISPOSITION

Because the Labor Code provisions pleaded by the plaintiffs do not state a cause of action imposing personal liability on a corporate agent for unpaid employee wages and expenses, we must reverse the judgment against appellant. The trial court did not rule on plaintiffs' alter ego liability theory, and we therefore remand for consideration of that issue. Appellant is entitled to his costs on appeal. (Cal. Rules of Court, rule 27.)

O'Leary, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied April 13, 2006, and the opinion was modified to read as printed above.