[No. D055586. Fourth Dist., Div. One. Feb. 27, 2012.]

LEANDER H. THURMAN, Plaintiff and Appellant, v.
BAYSHORE TRANSIT MANAGEMENT, INC., et al., Defendants and
Appellants.

**COUNSEL**

Neyhart, Anderson, Flynn & Grosboll, John L. Anderson and Benjamin K. Lunch for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, J. Rod Betts and Michael J. Etchepare for Defendants and Appellants.

**OPINION**

**AARON, J.**—In January 2004, Amalgamated Transit Union, Local 1309, AFL-CIO (the union), filed a representative action on behalf of its member bus drivers who worked in and around National City, California, alleging that the various defendant employers had violated provisions of the Labor Code[1] that require employers to provide meal and rest periods for their employees. In February 2005, the union filed an operative verified third amended

---

[1] All subsequent statutory references are to the Labor Code unless otherwise specified.

complaint, which added a number of individual employees as plaintiffs, including appellant Leander H. Thurman. The named defendants included appellants Bayshore Transit Management, Inc. (Bayshore), and its parent corporation McDonald Transit Associates, Inc. (McDonald) (collectively defendants), who, until March 3, 2007, contracted with the City of National City to operate National City Transit (NCT), a carrier that ran three fixed bus routes in the city.[2] At the time of trial, Thurman was the only remaining plaintiff, and McDonald and Bayshore were the only remaining defendants in the action.

After a bench trial, the trial court filed a statement of decision and entered a judgment imposing civil penalties, including unpaid wages, in the total amount of $358,588.22, against defendants under the Labor Code Private Attorneys General Act of 2004 (PAGA), section 2698 et seq. The court also awarded Thurman restitution in the amount of $28,605 under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and prejudgment interest in the amount of $10,253. Both Thurman and defendants appeal from the judgment.

Thurman contends that the trial court committed reversible error in (1) denying his request to continue the trial to allow him to bring a noticed motion for class certification, after the California Supreme Court issued a decision that precluded the union from maintaining its representative action; (2) denying class certification;[3] (3) denying him recovery of civil penalties under both section 558, and wage order No. 9-2001 issued by the Industrial Welfare Commission (IWC), codified in California Code of Regulations, title 8, section 11090 (Wage Order No. 9); (4) reducing defendants' civil penalties under section 2699, subdivision (e); and (5) ruling that defendants' liability for his UCL claims began on January 1, 2002, rather than on October 1, 2000, due to the collective bargaining exemption in the former version of section 514. With respect to this claim, Thurman further contends that even if former section 514 created a collective bargaining exemption, section 226.7

---

[2] The parties indicate that defendants contracted with Metropolitan Transit System (MTS). However, at trial, John P. Webster, Sr., a former vice-president and general manager of NCT, testified that in March 2007 the right to contract for transit services was shifted from the City of National City to MTS, and that MTS awarded the contract for the National City bus routes to a different provider.

[3] Thurman filed separate notices of appeal from the order denying his motion to continue the trial, the order denying his motion for class certification, and the judgment. He contends that the orders are appealable under the "death-knell" doctrine—i.e., as orders that effectively terminate the action as to all members of an alleged class. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [63 Cal.Rptr. 724, 433 P.2d 732].) We need not decide whether the orders are separately appealable under the death-knell doctrine because even if they are not, they are reviewable on Thurman's appeal from the judgment. (Code Civ. Proc., § 906; *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 241–242 [273 P.2d 5].)

provides an independent basis for recovering unpaid wages for missed meal and rest periods, effective January 1, 2001.

Defendants contend that the trial court erred in (1) awarding unpaid wages under section 558 as a civil penalty; (2) awarding Thurman relief under the PAGA, because Thurman failed to exhaust his administrative remedies before he was named as a plaintiff in the third amended complaint; (3) allowing Thurman to recover PAGA penalties on behalf of other bus operators for missed rest periods under section 558, because that statute allows recovery for missed meal periods only, and not for missed rest periods; and (4) allowing Thurman to avoid the judicial admission, set forth in his complaint, that defendants had provided meal periods since July 2003, and permitting him to recover for missed meal periods after July 2003. We agree with defendants' last contention. Accordingly, we reverse the portions of the judgment awarding recovery for missed meal periods and remand for a redetermination of that recovery. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

NCT operated three bus routes in the National City area, designated as Routes 601, 602, and 603. Thurman began his employment with NCT as a bus driver in 1993. The union represented the NCT bus drivers, including Thurman, and negotiated two collective bargaining agreements with NCT that are relevant to this case. The first collective bargaining agreement was in effect from August 1, 1996, through July 31, 2002; the second collective bargaining agreement was in effect from August 1, 2002, through July 2007.

When the second collective bargaining agreement went into effect on August 1, 2002, NCT bus drivers were assigned to drive Route 601, 602, or 603 as either a "straight run" or a "split run." A driver who worked a straight run would drive continuously from the beginning of a shift until the end of the shift, with no break period or "split" during the shift. Drivers on straight runs were not provided a 30-minute meal period. Drivers who worked split runs would take an unpaid break of 30 minutes to an hour at some point during their shifts.

◼ In 1999, the Legislature enacted section 512, which requires employers to provide a meal period of at least 30 minutes for a daily work period of more than five hours' duration. In October 2000, the IWC issued Wage Order

---

[4] Because the parties have expressly stated that they do not dispute the accuracy of the facts as set forth in the court's statement of decision, we have based our presentation of the relevant facts, in part, on that document.

No. 9, which authorized penalties for an employer's failure to provide required meal and rest periods.[5]

In January 2003, Stephen Keiper, a management employee of NCT,[6] had a lunch meeting with the union's president, George Thompson, at which they discussed meal and rest periods. Thompson told Keiper that the union and the drivers were strongly opposed to working split runs as a means of implementing the required meal breaks because doing so would extend their workday, without any additional pay. The union's shop steward, Leonard James, also told Keiper on several occasions that the employees were opposed to split runs. Keiper asked Thompson to provide "some kind of document" that would operate as a release of NCT's obligation to provide meal periods, and Thompson agreed to provide a letter from the union to that effect.

Keiper never received a letter from Thompson. Keiper eventually called Thompson to inform him that NCT would have to implement a plan to provide meal periods for the drivers. Thompson told Keiper that he was unable to provide the letter that they had discussed because the union was now taking a different position. On July 6, 2003, NCT imposed split runs on all of its bus routes, despite objections voiced by local union representatives and individual bus drivers, in order to comply with the law that required that meal periods be provided. The trial court found that during the "straight run era" (prior to July 6, 2003), meal periods were provided on 13 percent of the NCT runs, and were not provided on 87 percent of the runs. The court found that between July 6, 2003, and March 3, 2007, NCT provided meal periods of at least 30 minutes to all drivers whose shifts had splits of 36 minutes or more.

In June 2004, NCT posted a memorandum reminding its bus drivers that they were permitted to take a 10-minute rest period for each four-hour period that they worked, and directing them to take their rest break during the " 'recovery time' already 'built in' at the start/end of [their] runs . . . ." The memorandum instructed drivers who worked schedules that provided less than the required rest time to make sure that they "allow[ed] for this rest

---

[5] The IWC "is an administrative body within the Division of Labor Standards Enforcement, consisting of five members appointed by the Governor. The [IWC] determines the wages, hours, and working conditions of all employees, except outside salesmen, in [various] industries." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 205 [157 Cal.Rptr. 840, 599 P.2d 31], fns. omitted.) "Today 18 wage orders [issued by the IWC] are in effect, 16 covering specific industries and occupations, one covering all employees not covered by an industry or occupation order, and a general minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 57 [109 Cal.Rptr.3d 514, 231 P.3d 259], fns. omitted (*Martinez*); see Cal. Code Regs., tit. 8, §§ 11000–11170.)

[6] Keiper became the interim general manager of NCT in February 2003.

period even if it [meant] leaving a few minutes late from [their] starting/ending time points." NCT also posted a second memorandum that further explained the procedure drivers were to follow for taking 10-minute rest periods. On June 28, 2004, NCT's general manager, Webster, sent a letter to Thompson stating that the rest periods were working smoothly, and asking Thompson to let Webster know if Thompson had any questions or concerns regarding the manner in which NCT was handling the rest period issue. Thompson did not respond to Webster's letter.

In March 2005, NCT complied with a request by then union president Steve Alcove to send him documentation showing NCT's route schedules and reflecting that NCT was providing the bus drivers with 10-minute rest periods and 30-minute meal periods. Alcove responded with an e-mail message stating that he had received the schedules and would show the union's attorney that "the 10-[minute] breaks were included in the schedule." In July 2005, Thurman, who was then the union steward, told Webster and NCT operations manager Gabriel Marquez that he had informed Alcove that the NCT drivers were taking their 10-minute rest breaks.

In January 2004, the union filed a verified complaint against NCT and other defendants[7] as a representative action on behalf of its members and other bargaining unit employees who were employed by the defendants during the relevant time period. In February 2005, the union filed the operative verified third amended complaint, which added Thurman as a plaintiff and included two causes of action—a first cause of action alleging that defendants had violated sections 226.7 and 512 and Wage Order No. 9 by failing to provide meal and rest periods or compensation in lieu of meal and rest periods, and a second cause of action for violation of the UCL, based on the same allegations as the first cause of action.

Defendants filed a demurrer and motion to strike portions of the third amended complaint. Defendants demurred to the first cause of action on the grounds that the union lacked standing to bring that cause of action on behalf of its members under the PAGA, and that all plaintiffs had failed to exhaust their administrative remedies, as required under section 2699.5, as a prerequisite to bringing a PAGA claim. As to the union, defendants demurred to the second cause of action on the ground that the union, itself, had not been injured by defendants' alleged improper meal and rest period practices, and that it therefore lacked standing to assert a cause of action under the UCL. Defendants also demurred to the second cause of action to the extent that it sought relief on a representative basis, arguing that a private person may bring a representative action under the UCL only if that person complies with

---

[7] As noted, McDonald and Bayshore were the only remaining defendants in the action at the time of trial.

class action certification requirements, and contending that none of the plaintiffs had adequately pleaded a class action.[8]

On December 6, 2005, the trial court overruled defendants' demurrer and denied their motion to strike, concluding that the union had standing to bring both causes of action because it had obtained assignments of claims from all of its members. The court's ruling did not address defendants' demurrer to the first cause of action on the ground that all plaintiffs had failed to exhaust their administrative remedies before bringing a PAGA claim. On December 16, 2005, defendants filed a motion for reconsideration based on the circumstance that on November 23, 2005, after the court had taken the demurrer and motion to strike under submission but before it issued its ruling, the Second District Court of Appeal held in *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 378 [36 Cal.Rptr.3d 31] (*Caliber Bodyworks*), that a plaintiff must exhaust administrative remedies under the PAGA before filing an action to recover civil penalties that the state could otherwise pursue. The *Caliber Bodyworks* court held that a demurrer on the ground of failure to exhaust administrative remedies must be sustained as to a cause of action that seeks only recovery of civil penalties, and that a motion to strike on that ground is appropriate if a cause of action seeks recovery of civil penalties and other relief. (*Caliber Bodyworks, supra,* at pp. 381–385.) Accordingly, defendants asked the court to strike the portions of the third amended complaint that sought civil penalties subject to the PAGA's exhaustion requirements.

After reconsidering its ruling on defendants' demurrer and motion to strike, the trial court declined to change the ruling. The court determined that *Caliber Bodyworks* did not apply to this action because the statutory amendments that created the administrative remedies that a plaintiff must exhaust in order to recover civil penalties under the PAGA were enacted after the action was filed.

In October 2006, the trial court stayed the case for six months, pursuant to the parties' stipulation. The purpose of the stay was "to give the parties and the Court the benefit of the California Supreme Court's consideration and resolution of the conflicting [appellate court] decisions concerning the applicable statute of limitations [for claims] of Labor Code [section] 226.7 violations." The stay was lifted by stipulation and order on June 1, 2007, and the case was set for trial on May 30, 2008.

In January 2008, the parties stipulated to continue the trial date to September 8, 2008. Among other reasons, the parties stipulated to the

---

[8] Defendants moved to strike various portions of the third amended complaint based on the arguments that they raised in their demurrer.

continuance "to permit the California Supreme Court to issue a decision in the matter captioned <u>Amalgamated Transit Union, Local 1756, et al.</u> v. <u>First Transit, Inc., et al., Case No. S151615</u> . . . ." In their ex parte application to the trial court for the stipulated continuance, plaintiffs explained that the outcome of the Supreme Court case "would fundamentally affect the case at bar in that an adverse ruling against Plaintiffs would necessitate class certification which would leave the case in a considerably different procedural posture, potentially on the eve of trial . . . ."[9] The trial court continued the trial date to September 12, 2008. In May 2008, the parties again stipulated to a trial continuance to allow the California Supreme Court to issue its opinion in *Amalgamated Transit* prior to the trial in this case. The trial court continued the trial date to January 9, 2009, based on the parties' stipulation. In September 2008, the trial court again continued the trial date to June 5, 2009.

In April 2009, the union and its coplaintiffs applied ex parte to continue the trial date to at least January 15, 2010, based on the unavailability of plaintiffs' counsel[10] and the fact that the California Supreme Court had not yet issued its decision in *Amalgamated Transit* and was considering another case that could affect the outcome of the present case. Defendants filed a response stating that they did not oppose a continuance of the trial to accommodate plaintiffs' counsel's 60-day emergency medical leave of absence, but that they objected to continuing the trial to January 2010. Noting that the California Supreme Court was expected to issue its decision in *Amalgamated Transit* by June 2009, defendants argued that a new trial date of July 20 or 27, 2009, would be appropriate. The trial court continued the trial date to July 24, 2009.

On June 29, 2009, the California Supreme Court filed its decision in *Amalgamated Transit*. The court held that a labor union that has not suffered actual injury under the UCL and is not an "aggrieved employee" under the PAGA may not bring a representative action under those laws, either as an assignee of employees who have suffered actual injury and are aggrieved employees, or as an association whose members have suffered actual injury and are aggrieved employees. (*Amalgamated Transit, supra,* 46 Cal.4th at

---

[9] One of the issues that the California Supreme Court ultimately decided in *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993 [95 Cal.Rptr.3d 605, 209 P.3d 937] (*Amalgamated Transit*) was whether a labor union that has not suffered actual injury under the UCL and is not an "aggrieved employee" under the PAGA may nevertheless bring a representative action under those laws, either as an assignee of employees who have suffered actual injury and are aggrieved employees, or as an association whose members have suffered actual injury and are aggrieved employees. (*Amalgamated Transit, supra,* at p. 998.)

[10] Plaintiffs stated that their sole attorney had recently taken an emergency medical leave of absence that was expected to last at least 60 days, and pointed out that one of the defense attorneys was on disability and maternity leave through September 2009.

p. 998.) On July 2, 2009, plaintiffs filed a "NOTICE OF DECISION BY CALIFORNIA SUPREME COURT," in which they asserted that because the union no longer had standing to bring a representative action in light of the *Amalgamated Transit* decision, in order for the case to proceed, it would have to be certified as a class action with an individual class representative. Plaintiffs stated that they intended to propose Thurman as the class representative, and requested that the trial court vacate the July 24, 2009 trial date pending their contemplated motion for class certification. Defendants filed a response in which they strongly objected to any further continuance of the trial date.

On July 7, 2009, Thurman filed a formal request for a continuance of the trial, to permit him to bring a motion for class certification. Defendants filed an opposition to the request. At the trial readiness conference on July 10, 2009, the trial court denied Thurman's request to continue the trial. Thurman filed a petition for writ of mandate and request for stay with this court on July 13, 2009, challenging the trial court's denial of his request for a continuance of the trial date. This court denied Thurman's petition on July 14, 2009.

The bench trial began on July 24, 2009. On Friday, July 31, a week into the trial, Thurman filed a motion for class certification. The trial court denied the motion the following Monday. After the trial, the court filed a statement of decision and entered a judgment imposing civil penalties, including unpaid wages, against defendants under the PAGA in the total amount of $358,588.22, and awarding Thurman restitution under the UCL in the amount of $28,605 and prejudgment interest in the amount of $10,253.

## DISCUSSION

### *OVERVIEW OF THE PAGA*

"Under the Labor Code, the Labor and Workforce Development Agency (LWDA) and its constituent departments and divisions are authorized to collect civil penalties for specified labor law violations by employers. [Citation.] To enhance the enforcement of the labor laws, the Legislature enacted PAGA in 2003." (*Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 216 [120 Cal.Rptr.3d 166] (*Home Depot*).) In doing so, the Legislature "declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain

primacy over private enforcement efforts." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980 [95 Cal.Rptr.3d 588, 209 P.3d 923] (*Arias*).)

 Section 2699, subdivision (a), part of the PAGA "permits aggrieved employees to recover civil penalties that previously could be collected only by LWDA. [Citation.] In addition, to address violations for which no such penalty had been established, subdivision (f) of the statute created 'a default penalty and a private right of action' for aggrieved employees."[11] (*Home Depot, supra,* 191 Cal.App.4th at p. 216.) Section 2699.3 sets forth certain administrative procedures that an aggrieved employee must follow before bringing a PAGA action.

*THURMAN'S APPEAL*

I.

*Denial of Trial Continuance*

 Thurman contends that the trial court's denial of his request for a continuance of the trial date to allow him time to bring a noticed motion for class certification was reversible error. "The decision to grant or deny a continuance is committed to the sound discretion of the trial court. [Citation.] The trial court's exercise of that discretion will be upheld if it is based on a reasoned judgment and complies with legal principles and policies appropriate to the case before the court. [Citation.] A reviewing court may not disturb the exercise of discretion by a trial court in the absence of a clear abuse thereof appearing in the record." (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984 [118 Cal.Rptr.2d 715].) California Rules of Court, rule 3.1332(d),[12] provides that in ruling on a request for a continuance "the court must consider all the facts and circumstances that are relevant to the determination." Among other facts and circumstances, the trial court properly considers the proximity of the trial date, whether there were previous trial continuances, the length of the requested continuance, and the prejudice that parties or witnesses would suffer as a result of the continuance. (Rule 3.1332(d).)

---

[11] Subdivision (f) of section 2699 provides: "For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: [¶] (1) If, at the time of the alleged violation, the person does not employ one or more employees, the civil penalty is five hundred dollars ($500). [¶] (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation. [¶] (3) If the alleged violation is a failure to act by the Labor and Workplace Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, there shall be no civil penalty."

[12] All further rule references are to the California Rules of Court unless otherwise specified.

We find no abuse of discretion in the trial court's denial of a continuance of the trial to allow Thurman to seek class certification. Trial continuances are disfavored and may be granted only on an affirmative showing of good cause. (Rule 3.1332(c); *County of San Bernardino v. Doria Mining & Engineering Corp.* (1977) 72 Cal.App.3d 776, 781 [140 Cal.Rptr. 383].) Thurman argues that the California Supreme Court's decision in *Amalgamated Transit* constituted good cause to continue the trial because that decision essentially reversed the trial court's earlier ruling on demurrer that the union had standing to prosecute the PAGA and UCL claims in the third amended complaint in a representative capacity on behalf of its member employees. Thurman states that the trial court's "apparent suggestion that [he] should have moved for class certification before the Supreme Court's decision in *Amalgamated Transit* . . . is perplexing [because] the California courts' resources are presumably better spent adjudicating actual disputes rather than hearing motions that a court has ruled to be unnecessary."

Notwithstanding the trial court's earlier ruling that the union had standing to bring representative claims, Thurman's counsel's decision not to pursue a class action unless and until the California Supreme Court in *Amalgamated Transit* issued a decision contrary to the trial court's ruling was a dubious strategy, particularly in light of the procedural history of *Amalgamated Transit*. The trial court in *Amalgamated Transit* ruled that the plaintiff unions lacked standing under the UCL because they had not suffered actual injury, and that they also lacked standing under the PAGA because they were not " 'aggrieved employees.' " (*Amalgamated Transit, supra,* 46 Cal.4th at p. 999.) The trial court further ruled that employee assignments of rights to the plaintiff unions did not confer standing, and that the UCL claims brought on behalf of others must be brought as a class action. (46 Cal.App.4th at p. 999.) The plaintiff unions petitioned the Second District Court of Appeal for a writ of mandate and a stay of the trial court's ruling. After issuing a stay and an order to show cause, the Court of Appeal denied the petition. (*Ibid.*)

Thurman's counsel in the present case represented the plaintiffs in *Amalgamated Transit* and was therefore well aware of the Second District Court of Appeal's decision in that case. Counsel should also have been aware of the distinct possibility that the California Supreme Court would uphold the Court of Appeal's decision. If Thurman's counsel's strategy was to pursue a class action in the event the Supreme Court decided against the union's representational standing in *Amalgamated Transit*, the prudent course would have been to amend the complaint in this case to allege a class action, and to move for class certification soon after the Court of Appeal filed its decision, rather than waiting until the eve of trial to do so. Counsel chose the latter course at its peril, particularly in light of the fact that the process of seeking

certification and the time needed to prepare to try a class action would have necessitated a substantial continuance in a case that had already been pending for over five years.

In denying Thurman's request for a continuance, the trial court stated that Thurman had not made an affirmative showing of good cause for a continuance, noting that the trial date had been continued "already at least once."[13] In its statement of decision, the trial court explained that in denying the request for another continuance, it had "considered the applicable law and pertinent facts and balanced all relevant factors, including the prolonged nature of this case, the absence of class allegations in the [third amended complaint], and the undue prejudice to defendants if the trial were again continued."

The trial court reasonably found that defendants would be unduly prejudiced by another continuance of the trial date. As defendants point out, cases are statutorily required to be brought to trial within five years (Code Civ. Proc., § 583.310), to " 'prevent[] prosecution of stale claims where defendants could be prejudiced by loss of evidence and diminished memories of witnesses [and] to protect defendants from the annoyance of having unmeritorious claims against them unresolved for unreasonable periods of time.' " (*Sagi Plumbing v. Chartered Construction Corp.* (2004) 123 Cal.App.4th 443, 447 [19 Cal.Rptr.3d 835].) The trial court noted during posttrial proceedings that its decision to deny Thurman's request for a trial continuance was justified in hindsight by the fact that, in the court's words, "[t]here were many witnesses with faulty memories, and that situation would have gotten worse, not better, if I had adopted plaintiff's proposal to continue the trial again to allow for an amendment to the complaint and a motion to certify the case as a class action. . . . The foibles of memory are real, and they were repeated numerous times through the course of this trial."

Thurman essentially gambled that the Supreme Court would reverse the Court of Appeal on the standing issue in *Amalgamated Transit*, and lost. The trial court reasonably decided that Thurman should bear the consequences of that gamble rather than subject defendants to the prejudice that would result from continuing the trial again for the purpose of allowing Thurman to pursue class certification. Given the protracted history of the case, the prior continuances, and the prejudice to defendants that would result from an additional continuance, the trial court acted well within its discretion in denying Thurman's request for a trial continuance.

---

[13] In fact, as noted, after the court ordered the case stayed for six months based on the parties' stipulation, it continued the trial date four times.

## II.

### Denial of Class Certification

Despite the trial court's denial of a continuance and the absence of any class action allegations in the third amended complaint, Thurman filed a motion to certify the case as a class action on the fourth day of trial. We reject Thurman's contention that the trial court committed reversible error in denying that motion. A trial court is afforded great discretion in deciding whether to grant or deny class certification, and we review the trial court's ruling for abuse of discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].) A reviewing court generally will not disturb a ruling that is supported by substantial evidence unless the trial court used improper criteria or made erroneous legal assumptions. (*Ibid.*) Any valid reason that the trial court provides in granting or denying certification is sufficient to uphold the order. (*Ibid.*)

The trial court stated numerous valid reasons for denying certification. In its minute order denying Thurman's certification motion, the court noted that the third amended complaint included neither the designation "CLASS ACTION" nor a separate section containing class action allegations, as required by rule 3.761.[14] The court stated that as a result, defendants had not been properly placed on notice that Thurman wished to proceed as a class action, and that certification at that "late date would be prejudicial in light of the requirement that the court allow the opportunity for discovery before ruling on a class certification motion."[15]

The trial court further ruled that a class action was not a superior "mode of adjudication" in this case, based on evidence that at any given time there were between 20 and 25 drivers employed by defendants and that "the back pay claims, if established, would be substantial, in other words, one or two hours of pay at . . . $7 and 14 per hour . . . per workday for several years,

---

[14] Rule 3.761(a) provides: "A complaint for or against a class party must include in the caption the designation 'CLASS ACTION.' This designation must be in capital letters on the first page of the complaint, immediately below the case number but above the description of the nature of the complaint." Rule 3.761(b) provides: "The complaint in a class action must contain a separate heading entitled 'CLASS ACTION ALLEGATIONS,' under which the plaintiff describes how the requirements for class certification are met."

[15] As authority for the discovery requirement, the trial court cited *Stern v. Superior Court* (2003) 105 Cal.App.4th 223 [129 Cal.Rptr.2d 275], in which the Court of Appeal held that "[e]ach party . . . must have an opportunity to conduct discovery on class action issues before filing documents to support or oppose a class action certification motion [citations] so the trial court can realistically determine if common questions are sufficiently pervasive to permit adjudication in a class action." (*Id.* at pp. 232–233, fn. omitted.)

plus potential penalties."[16] The court further stated: "[Thurman] apparently wants the court to certify a class and have the court adjudicate the class claims simultaneously—thereby skipping the steps of class notice and opportunity for opt-out. This raises serious due process concerns as to absent class members." In its statement of decision, the court summarized that it had "denied [Thurman's] motion for class certification based on insufficient notice under the California Rules of Court, undue prejudice to defendants, and due process concerns for putative class members who had not been notified and given the opportunity to opt out of the class. It should be noted that the court's July 10 concerns about the additional passage of time were borne out by some of the trial testimony. With the passage of several years since the events in question, there were more than a few instances of witnesses not recalling or misremembering important facts." (Original underscoring.)

The trial court's concern that the due process rights of absent class members would be compromised if Thurman were allowed to obtain class certification *during trial* was, by itself, a valid reason to deny certification. Thurman's failure to plead a class action in the third amended complaint as required by rule 3.761, and his concomitant failure to put defendants on notice that he wished to proceed as a class action were additional valid reasons to deny certification, since these omissions prejudiced defendants' right to conduct discovery before the court ruled on a class certification motion. The trial court did not abuse its discretion in denying Thurman's class certification motion.

## III.

### *Denial of Civil Penalties Under Both Section 558 and Wage Order No. 9*

Thurman contends that the trial court erred in rejecting his claim that he may recover PAGA penalties under both Wage Order No. 9 and section 558.

Section 558 provides, in relevant part: "(a) Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the [IWC] shall be subject to a civil penalty as follows: [¶] (1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. [¶] (2) For each subsequent

---

[16] In this portion of the trial court's order, the court implies that it viewed the class members' individual claims as being large enough to make the pursuit of individual claims likely, and a superior mode of adjudication to a class action.

violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. [¶] (3) Wages recovered pursuant to this section shall be paid to the affected employee. [¶] . . . [¶] (c) The civil penalties provided for in this section are in addition to any other civil or criminal penalty provided by law."

Wage Order No. 9, section 20, entitled "Penalties" states, in relevant part: "(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of: [¶] (1) Initial Violation—$50.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages. [¶] (2) Subsequent Violations—$100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages. [¶] (3) The affected employee shall receive payment of all wages recovered."

Thurman argues that the two penalty provisions are independent, and that he is entitled to recover under both because section 558, subdivision (c), states that "[t]he civil penalties provided for in this section are in addition to any other civil or criminal penalty provided by law," and section 20 of Wage Order No. 9 similarly states that the penalties provided therein are "[i]n addition to any other civil penalties provided by law."

The trial court ruled that Thurman could not recover civil penalties under the IWC wage orders. The court reasoned that section 2699, subdivision (a), of the "PAGA allows the recovery of civil penalties only for violations of 'this code,' meaning the California Labor Code,"[17] and that allowing Thurman to recover PAGA penalties under both section 558 and Wage Order No. 9 would "allow an impermissible double recovery for the same act." We conclude that the trial court was correct on both points.

 It is well settled that there is a private right of action to enforce a *statute* "only if the statutory language or legislative history affirmatively

---

[17] Section 2699, subdivision (a), which establishes the right of an aggrieved employee to sue on behalf of other employees, states: "Notwithstanding any other provision of law, any provision of *this code* that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3." (Italics added.)

indicates such an intent. [Citations.] That intent need not necessarily be expressed explicitly, but if not it must be strongly implied. [Citations.] Particularly when regulatory statutes provide a comprehensive scheme for enforcement by an administrative agency, the courts ordinarily conclude that the Legislature intended the administrative remedy to be exclusive unless the statutory language or legislative history clearly indicates an intent to create a private right of action." (*Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 850 [40 Cal.Rptr.3d 653].)

 Thurman is essentially arguing that the PAGA creates a private right of action to directly enforce a *wage order* promulgated by the IWC. However, a wage order is not a statute. As the trial court correctly pointed out, the PAGA authorizes recovery of civil penalties only for violations of the Labor Code. (§ 2699, subd. (a).) Although PAGA actions can serve to *indirectly* enforce certain wage order provisions by enforcing *statutes* that require compliance with wage orders (e.g., § 1198, which prohibits longer work hours than those fixed by wage order or employment under conditions prohibited by a wage order),[18] the PAGA does not create any private right of action to *directly* enforce a *wage order*. (See *Home Depot, supra*, 191 Cal.App.4th at p. 218 [employer's failure to provide seating for employees required by wage order was a violation of § 1198]; *Bright v. 99¢ Only Stores* (2010) 189 Cal.App.4th 1472, 1478 [118 Cal.Rptr.3d 723] [same].)

Only the Legislature, through enactment of a statute, can create a private right of action to directly enforce an administrative regulation, such as a wage order. (See, e.g., 47 U.S.C. § 227(b)(3)(A), part of the Telephone Consumer Protection Act of 1991 (Pub.L. No. 102-243 (Dec. 20, 1991) 105 Stat. 2394) [specifically authorizing a private right of action "based on a violation of this subsection or the regulations prescribed under this subsection . . . ."].) The IWC has not created, and has no power to create, a private right of action for violation of a wage order, and we are aware of no statute that creates a private right of action for a violation of an IWC wage order when the violation at issue is not also a violation of the Labor Code. Absent statutory authorization, there is no right of action under the PAGA to enforce an IWC wage order.

 In any event, the IWC has made it clear that the penalties set forth in section 20 of Wage Order No. 9 are duplicative, and *not* independent of the penalties set forth in section 558. Section 1177, subdivision (b), requires that the IWC "prepare a statement as to the basis upon which an adopted or

---

[18] Section 1198 states: "The maximum hours of work and the standard conditions of labor fixed by the commission shall be the maximum hours of work and the standard conditions of labor for employees. The employment of any employee for longer hours than those fixed by the order or under conditions of labor prohibited by the order is unlawful."

amended order is predicated."[19] As the trial court noted, the IWC's "Statement as to the Basis" regarding section 20 of its wage orders, including Wage Order No. 9, expressly states: "This section *sets forth the provisions of Labor Code § 558*, which specifies penalties for initial and subsequent violations." (Italics added.) Accordingly, the penalties stated in section 20 of Wage Order No. 9 are those provided by section 558; they are not recoverable independent of, and in addition to, those provided by section 558.

Thurman cites *Franco v. Athens Disposal Co., Inc.* (2009) 171 Cal.App.4th 1277 [90 Cal.Rptr.3d 539] (*Franco*) as an example of a case in which "at least one court" has concluded that section 20 of Wage Order No. 9 provides for civil penalties for violations of section 226.7, and that a plaintiff may seek those penalties under the PAGA. Section 226.7 provides: "(a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the [IWC]. [¶] (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the [IWC], the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."

The plaintiff in *Franco*, a trash truck driver, sued his employer for, among other Labor Code violations, denying meal and rest periods in violation of section 226.7. (*Franco, supra,* 171 Cal.App.4th at pp. 1282–1283.) The employer successfully petitioned for arbitration under an arbitration agreement that contained a provision waiving class arbitration and precluding the plaintiff from seeking civil penalties on behalf of other employees in a "private attorney general" capacity. (*Id.* at pp. 1283–1285.) The *Franco* court reversed the order granting the petition to compel arbitration, concluding that the arbitration agreement as a whole was tainted with illegality and was unenforceable because it contained a class arbitration waiver and precluded the plaintiff from seeking civil penalties on behalf of other employees, contrary to the PAGA. (171 Cal.App.4th at p. 1303.)

In considering the arbitration agreement's waiver of the right to bring claims in a private attorney general capacity, the *Franco* court examined the purpose of the PAGA and noted that the default civil penalty established by section 2699, subdivision (f), applied to violations of " 'all provisions of [the

---

[19] Section 1177 in its entirety provides: "(a) The commission may make and enforce rules of practice and procedure and shall not be bound by the rules of evidence. Each order of the commission shall be concurred in by a majority of the commissioners. [¶] (b) The commission shall prepare a statement as to the basis upon which an adopted or amended order is predicated. The statement shall be concurred in by a majority of the commissioners. The commission shall publish a copy of the statement with the order in the California Regulatory Notice Register. The commission also shall provide a copy of the statement to any interested party upon request."

Labor Code] *except those for which a civil penalty is specifically provided.'* " (*Franco, supra*, 171 Cal.App.4th at p. 1302.) The *Franco* court then noted that the California Supreme Court in *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1099, 1102–1111 [56 Cal.Rptr.3d 880, 155 P.3d 284] (*Murphy*) had held that the additional hour of pay for missed meal and rest periods provided by section 226.7 was a wage or premium pay, rather than a civil penalty (*Franco, supra*, at p. 1302). However, the *Franco* court concluded that section 20 of Wage Order No. 9 "specifically provides civil penalties for violations of section 226.7." (*Franco, supra*, at p. 1303.)

We disagree with the *Franco* court's conclusion that the penalties set forth in section 20 of Wage Order No. 9 provide an independent basis for the assessment of civil penalties for violations of section 226.7. Because section 226.7 does not specifically provide for a civil penalty, the civil penalty for a violation of section 226.7 would be the default penalty established by section 2699, subdivision (f). (*Home Depot, supra*, 191 Cal.App.4th at p. 218; *Bright v. 99¢ Only Stores, supra*, 189 Cal.App.4th at pp. 1480–1481.)

The *Franco* court apparently assumed that the penalties provided by section 20 of Wage Order No. 9 are civil penalties that a plaintiff may recover in a PAGA action. However, the *Franco* court's focus was whether an arbitration agreement could validly preclude an employee from asserting claims on behalf of other employees under the PAGA; the court did not consider whether a PAGA plaintiff generally may recover a penalty provided in a wage order, as opposed to one provided in a Labor Code section. *Franco* thus does not support Thurman's claim that he is entitled to recover penalties under both section 558 and section 20 of Wage Order No. 9.[20] The trial court correctly rejected that claim.

---

[20] In his reply brief, Thurman also asserts that in *Martinez, supra*, 49 Cal.4th 35, the California Supreme Court "reaffirmed the principle that provisions of the Wage Orders may be enforced by private plaintiffs." Specifically, Thurman quotes the Supreme Court's statements that "the courts have shown the IWC's wage orders extraordinary deference, both in upholding their validity and in enforcing their specific terms" (*id.* at p. 61), and that "[c]ourts must enforce [definitional] provisions in wage actions because, as we have explained, an employee who sues to recover unpaid minimum wages under section 1194 actually sues to enforce the applicable wage order" (*Martinez, supra*, at p. 62). *Martinez* went on to state: "Only by deferring to wage orders' definitional provisions do we truly apply section 1194 according to its terms by enforcing the 'legal minimum wage' . . . ." (*Martinez, supra*, at p. 62.)

A key distinction between *Martinez* and the present case is that section 1194 expressly creates a private right of action for failure to pay minimum wage or overtime compensation. The fact that an action under section 1194 serves to enforce a wage order because the wage order's definition of "legal minimum wage" is controlling in the action is irrelevant to the issue whether a plaintiff bringing an action under the PAGA may recover a civil penalty provided by a wage order, as opposed to a section of the Labor Code. There is no language in *Martinez* that authorizes a private action to recover penalties provided by a wage order.

IV.

### Reduction of Defendants' Civil Penalties Under Section 2699, Subdivision (e)

Section 2699, subdivision (e)(2) provides that "[i]n any action by an aggrieved employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." The court calculated the maximum penalty amount that it could award under section 558 to be "$50 per pay period per employee for each pay period during which either a missed meal or rest period is identified in accordance with the findings of this Court, during the period between January 12, 2003 and March 3, 2007." The court then reduced that amount by 30 percent under section 2699, subdivision (e)(2), and assessed the reduced amount as a civil penalty, ruling that "[t]o do otherwise under the particular facts and circumstances of this case would be unjust, arbitrary, oppressive and confiscatory."

Thurman contends that the only proper inquiry under section 2699, subdivision (e)(2) in determining whether an award of the maximum penalty would be "unjust, arbitrary, oppressive, or confiscatory," is whether the defendant can afford to pay the maximum penalty amount, and that the defendant's conduct is irrelevant. Thurman maintains that because defendants did not present evidence that they could not afford to pay the maximum penalty amount, the trial court lacked discretion to award less than the maximum civil penalty under the PAGA.

Thurman cites no authority to support his contention that a trial court may reduce the amount of a civil penalty under section 2699, subdivision (e)(2) only if the court finds that the defendant cannot afford to pay the maximum penalty amount provided by statute. He cites *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1213 [78 Cal.Rptr.3d 572] (*Amaral*) for the proposition that civil penalties are mandatory, not discretionary—i.e., that the trial court lacks discretion to reduce a civil penalty to zero. However, the *Amaral* court also recognized that under section 2699, subdivision (e)(2) a trial court may "exercise its discretion *to award lesser penalties* based on the enumerated considerations." (*Amaral, supra*, at p. 1213, original italics.) Accordingly, we consider whether the trial court's award of civil penalties in an amount less than the statutory maximum was an abuse of discretion—i.e., whether the trial court reasonably determined that imposition of the maximum statutory penalty amount would result in an award that is unjust, arbitrary, oppressive, or confiscatory based on the facts and circumstances of this case.

We conclude that the trial court reasonably determined that an award of the maximum penalty amount would be unjust under the facts and circumstances of this case. The trial court cited the following facts and circumstances as warranting a reduction in penalties: (1) there was no evidence that the union insisted on adding meal or rest period provisions in its 2002 collective bargaining agreement with NCT and no grievance was filed under that agreement asserting that NCT was not providing meal and rest periods; (2) the union sent a letter to another transit company on August 5, 2002, asserting that the company was not providing meal and rest periods to its bus drivers but did not send a similar letter to NCT; (3) the evidence was undisputed that NCT unilaterally implemented split run shifts into its bus drivers' schedules in order to provide the drivers with meal and rest periods in July 2003, *over the objection of the drivers and the union*; (4) in June 2004 NCT posted memoranda to its bus drivers advising them to take 10-minute rest periods; (5) it was undisputed that union president Thompson did not respond to a June 28, 2004 letter from NCT's general manager Webster stating that rest periods were working smoothly following the posting of the rest period memoranda; (6) after union president Alcove was provided with the bus driver schedules in March 2005, he sent Webster an e-mail message in which he stated that he would show the union's attorney that the schedules included 10-minute rest breaks; (7) in July 2005 Thurman, who was at that time union steward, told Webster and Marquez that he had told Alcove that NCT was providing rest breaks; (8) in August 2005 Webster and Marquez counseled a bus driver about the need to take rest breaks; and (9) defendants lost the NCT contract in March 2007, rendering them unable to pay the penalties from ongoing revenues.

In summary, the trial court stated that the evidence showed "that after January 1, 2003 for meal periods and after June 7, 2004 for rest periods, defendants took their obligations under Wage Order No. 9 seriously and attempted to comply with the law." In light of that undisputed finding, and the facts and circumstances that the trial court specified in its statement of decision in support of the finding, the trial court reasonably determined that imposition of the maximum statutory penalty amount against defendants would be unjust—if not also arbitrary, oppressive, or confiscatory.

The evidence supports the trial court's penalty reduction even under Thurman's view that section 2699, subdivision (e)(2) requires evidence of inability to pay, because the trial court made the undisputed finding that defendants' loss of the NCT contract in March 2007 rendered them unable to pay penalties from ongoing revenues. The trial court did not abuse the discretion afforded it by section 2699, subdivision (e)(2) to reduce the civil penalties it imposed against defendants.

## V.

*Liability Starting Date for UCL Claims*

Thurman contends that the trial court erred in ruling that liability for his UCL claims began on January 1, 2002, due to the collective bargaining exemption in the original version of section 514, rather than on October 1, 2000, the effective date of Wage Order No. 9's penalty provision for failure to provide meal and rest breaks. We conclude that the trial court was correct in ruling that liability for Thurman's UCL claims began January 1, 2002.

In 1999, in response to the IWC's elimination of certain daily overtime rules, the Legislature passed the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999 (the 1999 Act), which "established a new statutory scheme governing hours of labor and overtime compensation for all industries and occupations." (*Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 434 [41 Cal.Rptr.3d 482] (*Bearden*).) The 1999 Act included section 512, which, with certain exceptions, requires employers to provide employees who work more than five hours per day a meal period of at least 30 minutes, and to provide employees who work more than 10 hours per day a second meal period of at least 30 minutes. (§ 512, subd. (a).)[21]

■ The 1999 Act also added sections 516 and 517. Section 516 originally provided: "*Notwithstanding any other provision of law*, the [IWC] may adopt or amend working condition orders with respect to break periods, meal periods, and days of rest for any workers in California consistent with the health and welfare of those workers." (§ 516, as added by Stats. 1999, ch. 134, § 10, p. 1825, italics added.) Effective September 2000, an amendment to section 516 replaced the opening phrase "Notwithstanding any other provision of law" with "Except as provided in Section 512 . . . ." (§ 516, as amended by Stats. 2000, ch. 492, § 4, p. 3503.)[22] Section 517, subdivision (a) states, in relevant part: "(a) The [IWC] shall, at a public hearing to be

---

[21] Section 512, subdivision (b) provides that "[n]otwithstanding subdivision (a), the [IWC] may adopt a working condition order permitting a meal period to commence after six hours of work if the commission determines that the order is consistent with the health and welfare of the affected employees."

[22] The Legislative Counsel explained the amendment to section 516 as follows: "Existing law authorizes the commission to adopt or amend working condition orders with respect to meal periods. Other existing law prohibits, except as provided, an employer from employing an employee for more than 5 hours per day without providing the employee with a meal period of not less than 30 minutes, or for employing an employee for more than 10 hours per day without providing the employee with a 2nd meal period of not less than 30 minutes. [¶] This bill would prohibit the commission from adopting a working condition order that conflicts with those 30-minute meal period requirements, except that the commission may adopt a working condition order permitting a meal period to commence after 6 hours of work if the commission

concluded by July 1, 2000, adopt wage, hours, and working conditions orders consistent with *this chapter* . . . ." (§ 517, as added by Stats. 1999, ch. 134, § 11, p. 1825, italics added.) The directive to adopt wage orders consistent with "this chapter" in section 517 was a directive to adopt wage orders consistent with the 1999 Act. (*Small v. Superior Court* (2007) 148 Cal.App.4th 222, 230 [55 Cal.Rptr.3d 410].)

The 1999 Act also included section 514, which originally provided: "*This chapter* [(§§ 500–558)] does not apply to an employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage." (§ 514, as added by Stats. 1999, ch. 134, § 8, pp. 1823–1824, italics added; see *Lazarin v. Superior Court* (2010) 188 Cal.App.4th 1560, 1570–1571 [116 Cal.Rptr.3d 596] (*Lazarin*).) In 2001, the Legislature amended section 514 by replacing its opening phrase, "This chapter does not apply," with the phrase: "Sections 510 and 511 do not apply." (§ 514, as amended by Stats. 2001, ch. 148, § 1, p. 1438.) Section 510 sets forth general rules regarding overtime pay and section 511 sets forth rules regarding alternative workweek schedules.

The collective bargaining agreement exemption set forth in the original version of section 514 expressly applied to the *entire chapter* that includes section 512, whereas the collective bargaining agreement exemption in section 514 as amended in 2001, applies only to sections 510 and 511. Accordingly, resolution of the question of when liability under the UCL began for defendants' violations of section 512, or any wage order adopted pursuant to section 516 or 517, depends on whether the original version of section 514 exempted workers who were covered by a qualifying collective bargaining agreement from *the entire chapter* containing section 514, or rather, exempted them from sections 510 and 511 only.[23]

■ "In construing a statute, a court's objective is to ascertain and effectuate legislative intent. [Citation.] To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) "If the statutory language is clear and unambiguous our inquiry ends. 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the

---

makes a specified determination." (Legis. Counsel's Dig., Sen. Bill No. 88 (1999–2000 Reg. Sess.) 6 Stats. 2000, Summary Dig., p. 212.)

[23] Thurman does not dispute that the collective bargaining agreement between the union and NCT that was in effect during the period of January 1, 2000, through July 2002 was a qualifying collective bargaining agreement under section 514.

statute governs.' [Citations.] In reading statutes, we are mindful that words are to be given their plain and commonsense meaning. [Citation.] . . . Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation." (*Murphy, supra,* 40 Cal.4th at p. 1103.)

 The original version of section 514 is neither ambiguous nor susceptible of more than one reasonable interpretation; it unambiguously stated that the provisions of "[t]his chapter" of the Labor Code—i.e., chapter 1 of part 2 (Working Hours) of division 2, consisting of sections 500 through 558—did not apply to employees who were covered by a valid collective bargaining agreement that expressly provided for the wages, hours of work, and working conditions of the employees and also provided for premium wage rates for overtime hours and regular hourly pay that was at least 30 percent above the state minimum wage. There is no need to turn to extrinsic aids to interpret the phrase "[t]his chapter does not apply." Because the phrase is unambiguous, we presume that the Legislature meant what it said and the plain meaning of the phrase governs.[24] (*Murphy, supra,* 40 Cal.4th at p. 1103.)

Thurman argues that despite the language of the original version of section 514 pertaining to its scope, it was never the Legislature's intent that the collective bargaining agreement exemption in section 514 apply to anything other than the overtime provisions of section 510 and the alternative workweek provisions of section 511. As support for this argument, Thurman relies in large part on *Valles v. Ivy Hill Corp.* (9th Cir. 2005) 410 F.3d 1071 (*Valles*) and *Lazarin, supra,* 188 Cal.App.4th 1560, in which the reviewing courts gave effect to language in an uncodified section of the 2001 legislation amending section 514, stating that the amendment was "declarative of existing law." (Stats. 2001, ch. 148, § 4, p. 1439; see *Valles,* at pp. 1079–1080; *Lazarin,* at pp. 1575–1576.)[25]

---

[24] The Legislature's intent that former section 514 made the entire chapter in which it is included inapplicable to employees covered by a qualifying collective bargaining agreement is further reflected in the plain language of the original version of section 554, which stated, in relevant part: "This chapter, with the exception of Section 558, shall not apply to any person employed in an agricultural occupation . . . , *nor shall the provisions of this chapter apply when the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pursuant to Section 514.*" (§ 554, as added by Stats. 1999, ch. 134, § 12, p. 1826, italics added.) Senate Bill No. 1208 (2001–2002 Reg. Sess.), which amended section 514 in 2001, also amended section 554 by deleting its collective bargaining agreement exemption language. (Stats. 2001, ch. 148, § 2, p. 1438.)

[25] The *Lazarin* court additionally noted: "That explanation of the purpose of the amendment, contained in an uncodified section of the legislation itself . . . is confirmed in the Senate Rules Committee, Office of Senate Floor Analysis, 3d reading analysis of Senate Bill No. 1208 (2001–2002 Reg. Sess.) as amended May 29, 2001, page 1, which states, 'This bill clarifies existing law relating to exclusion of the application of overtime requirements for employees covered by collective bargaining agreements.' The Senate third reading analysis of the bill, as

Defendants contend that the language of section 514, as operative from January 1, 2000, through December 31, 2001, exempted employers with a qualifying collective bargaining agreement from liability under the *entire chapter* containing section 514—i.e., chapter 1 of part 2 (Working Hours) of division 2, consisting of sections 500 through 558. They argue that the amendment of section 514 effected a substantive change in the law because employers, such as NCT, that had a valid collective bargaining agreement assumed they were exempt from all meal and rest period obligations until January 1, 2002.

" 'Generally, statutes operate prospectively only.' [Citations.] '[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . . For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." ' [Citations.] 'The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.' [Citation.]" *(McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475 [20 Cal.Rptr.3d 428, 99 P.3d 1015] *(McClung)*.) "[I]t has long been established that a statute that interferes with antecedent rights will not operate retroactively unless such retroactivity be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' [Citations.] '[A] statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.' " *(Ibid.)*

A statutory amendment that merely clarifies, rather than changes, existing law is deemed to not operate retrospectively, even if applied to actions that predate its enactment, " 'because the true meaning of the statute remains the same.' [Citation.] In that event, personal liability would have existed at the time of the actions, and the amendment would not have changed anything.

amended June 14, 2001, similarly comments, 'This bill is also designed to clarify the scope of two provisions of AB 60 [(the 1999 Restoration Act)], which exclude the application of overtime requirements to an employee covered by a qualifying collective bargaining agreement. AB 60 was intended to provide that an employee covered by such an agreement was not covered by requirements for daily overtime, an alternative workweek procedure, and one day's rest in seven. By clarifying that such exclusions are specific, and are not intended to apply to the entirety of Chapter One of Part Two (commencing with Section 500) of the Labor Code, this bill also confirms the IWC retains its authority to establish regulations regarding wage and hour matters for employees covered by a collective bargaining agreement.' " *(Lazarin, supra,* 188 Cal.App.4th at p. 1575.)

But if the amendment changed the law and imposed personal liability for earlier actions, the question of retroactivity arises." (*McClung, supra,* 34 Cal.4th at pp. 471–472.)

■ Notwithstanding the Legislature's declaration to the contrary, we conclude that the 2001 amendment to section 514 changed, rather than merely clarified, the law because it imposes liability on employers for past actions that were exempt from liability under the original version of section 514—i.e., the amendment imposed meal and rest period penalties on defendants for actions that they reasonably viewed as falling within the collective bargaining agreement exemption of the original version of section 514. It is settled that even if the courts have not conclusively interpreted a statute, " 'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute.' [Citations.] This is because the 'Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean.' [Citation.] A declaration that a statutory amendment merely clarified the law 'cannot be given an obviously absurd effect, and the court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms.' " (*McClung, supra,* 34 Cal.4th at p. 473.)

The legislative statement in Senate Bill No. 1208 (2001–2002 Reg. Sess.) that the amendment was "declarative of existing law" is insufficient to overcome the strong presumption against retroactivity. *McClung* supports the proposition that "an erroneous statement that an amendment merely declares existing law is [insufficient] to overcome the strong presumption against retroactively applying a statute that responds to a judicial interpretation." (*McClung, supra,* 34 Cal.4th at p. 476.) The Legislature's assertion that the amendment was intended to clarify existing law does not show "clear and unavoidable intent to have the statute retroactively impose liability for actions not subject to liability when taken. 'Requiring clear intent assures that [the legislative body] itself has *affirmatively considered the potential unfairness of retroactive application* and determined that it is an acceptable price to pay for the countervailing benefits.' [Citation.]" (*Ibid.,* italics added.) Retroactive application of the 2001 amendment to section 514 would impose liability for actions that were not subject to liability when taken. Although the Legislature expressed its intent that the amendment be construed as a clarification rather than a change in the law, there is no showing that it considered, let alone that it clearly and unequivocally intended, to impose such after-the-fact liability.

For these reasons, we conclude that the amendment does not apply retroactively to conduct that predated its enactment, and we disagree with *Valles* and *Lazarin* to the extent that they hold otherwise.

 Thurman contends that even if section 514 created a collective bargaining exemption, that exemption does not apply to section 226.7, which became effective on January 1, 2001, and provides an independent basis for recovering unpaid wages for missed meal and rest periods.[26] Section 226.7 imposes liability on employers who fail to provide meal or rest periods in accordance with *applicable* orders of the IWC. Thurman's contention thus raises the question whether Wage Order No. 9's meal and rest period requirements applied to Thurman between January 1, 2001, the effective date of section 226.7, and January 1, 2002, the effective date of the amendment to section 514 that limited section 514's collective bargaining agreement exemption to the overtime and alternative workweek provisions of sections 510 and 511.

 We conclude that the meal and rest period requirements in Wage Order No. 9 fell within the collective bargaining agreement exemption of the original version of section 514, applicable to "[t]his chapter," because they were adopted under the authority of statutes in the chapter referenced in section 514. As noted, section 516 authorized the IWC to "adopt or amend working condition orders with respect to break periods, meal periods, and days of rest for any workers in California consistent with the health and welfare of those workers," and section 517, subdivision (a), directed the IWC to "adopt wage, hours, and working conditions orders consistent with *this chapter*" (italics added)—i.e., consistent with the 1999 Act. (*Small v. Superior Court, supra,* 148 Cal.App.4th at p. 230.) Thus, the meal period requirement contained in section 11 of Wage Order No. 9 was adopted or amended under the authority of sections 516 and 517 in addition to section 512, and section 12 of Wage Order No. 9 regarding rest periods was adopted or amended under the authority of sections 516 and 517.[27] Because the meal and rest period requirements in Wage Order No. 9 existed in 2001 under the authority of chapter 1 of part 2 of division 2 of the Labor Code, consisting of sections 500 through 558, they did not apply to Thurman, since, as we concluded,

---

[26] As noted, section 226.7 provides: "(a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission. [¶] (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."

[27] We recognize that section 1173 provides general authorization to the IWC to adopt, rescind, or amend orders covering occupations, trades, and industries. However, the meal and rest period orders in question here were promulgated under the more specific authority of sections 512, 516, and 517.

*ante*, he fell within the collective bargaining agreement exemption in section 514 until January 1, 2002, the effective date of amended section 514. Accordingly, defendants incurred no liability under section 226.7 in 2001 because it was not until 2002, when the collective bargaining agreement exemption of section 514 became limited to the overtime and alternative workweek requirements of sections 510 and 511, that defendants failed to provide meal or rest periods "mandated by an *applicable* order of the [IWC]." (§ 226.7, subd. (a), italics added.) The trial court was therefore correct in ruling that liability for Thurman's UCL claims began January 1, 2002.[28]

---

[28] Presumably following the directive of section 517 to adopt orders consistent with "this chapter," the IWC included the collective bargaining agreement exemption language of section 514 in the meal period section (section 10(E)) of wage order No. 16-2000 (governing employees in construction, drilling, logging, and mining) effective October 1, 2000—after the effective date of the 1999 Act, including the original version of section 514. The *Bearden* court held that the IWC exceeded its authority in so doing, noting that an administrative agency's authority to adopt regulations is limited by the enabling legislation, and that an administrative regulation is invalid if it conflicts with the authorizing statute. (*Bearden, supra*, 138 Cal.App.4th at pp. 435–436; Gov. Code, §§ 11342.1, 1134.2.) The *Bearden* court decided that the IWC had exceeded its authority in adopting section 10(E) because section 512 regarding meal periods does not provide a collective bargaining agreement exemption from its requirements. (*Bearden, supra*, at pp. 435–440.) Curiously, the *Bearden* court did not mention section 514, let alone consider whether the IWC acted within the authority of section 514 when it added the collective bargaining agreement exemption to section 10(E).

In considering the validity of the same collective bargaining agreement exemption in section 10(E) of wage order No. 16-2000, the *Lazarin* court agreed with the *Bearden* court's conclusion that the IWC lacked authority to add a collective bargaining agreement exemption to section 10(E) under the *current* version of section 514, and also rejected the employer's argument that section 10(E) was valid at the time it was adopted under the *original* version of section 514. (*Lazarin, supra*, 188 Cal.App.4th at pp. 1574–1575.) Like the *Valles* court, the *Lazarin* court gave effect to the Legislature's declaration that amended version of section 514 clarified, rather than changed, existing law. (*Lazarin*, at pp. 1575–1576.)

We disagree with *Bearden* and *Lazarin* to the extent that they support the proposition that the collective bargaining agreement exemption in section 10(E) of wage order No. 16-2000 was inconsistent with or exceeded the scope of its authorizing statutes at the time the IWC adopted it. We agree with the defendant/employer's argument in *Lazarin* that when the IWC "adopted wage order 16, section 10(E), [it] was simply including the identical exemption already contained in section 514." (*Lazarin, supra*, 188 Cal.App.4th at p. 1574.)

The IWC also added a collective bargaining agreement exemption to section 11 regarding meal periods and section 12 regarding rest periods of Wage Order No. 9, presumably in accordance with section 514. However, for unknown reasons, these collective bargaining agreement exemptions are narrower than the exemption provided by section 514 and section 10(E) of wage order No. 16-2000, in that they apply only to collective bargaining agreements that specifically provide for meal periods (Wage Order No. 9, § 11F) or rest periods (Wage Order No. 9, § 12(C)). These exemptions would not apply to Thurman and his fellow NCT drivers because their collective bargaining agreement with NCT did not address meal or rest periods. In any event, the fact that the IWC included *any* collective bargaining agreement exemption in sections 11 and 12 of Wage Order No. 9 indicates that it was acting under the view that the collective bargaining agreement exemption in the original version of section 514 applied to the entire chapter containing section 514. We note, however, that limiting the exemption to collective bargaining agreements that specifically provide for meal and rest

## DEFENDANTS' APPEAL[29]

### I.

### Award of Unpaid Wages Under Section 558 as a Civil Penalty

Defendants contend that the trial court erred in awarding unpaid wages as a part of the civil penalty provided for in section 558. Section 558, subdivision (a), states: "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the [IWC] shall be subject to a civil penalty as follows: [¶] (1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid *in addition to an amount sufficient to recover underpaid wages.* [¶] (2) For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid *in addition to an amount sufficient to recover underpaid wages.* [¶] (3) Wages recovered pursuant to this section shall be paid to the affected employee." (Italics added.)

Defendants contend that section 558 draws a clear distinction between civil penalties and restitution for unpaid wages, and that the recovery of unpaid (or "underpaid")[30] wages is not part of the civil penalty of $50 or $100 per

---

periods (as opposed to collective bargaining agreements that generally provide for wages, hours of work, and working conditions) was inconsistent with the *original* version of section 514, and that including *any* collective bargaining agreement exemption in the meal and rest period sections (Wage Order No. 9, §§ 11, 12) is inconsistent with the *current* version of section 514.

[29] We grant defendants' unopposed request to take judicial notice of the following documents: (1) Assembly Committee on Appropriations, analysis of Assembly Bill No. 60 (1999–2000 Reg. Sess.) as amended March 22, 1999; (2) Assembly Committee on Labor & Employment, Analysis of Senate Bill No. 796 (2003–2004 Reg. Sess.) as amended July 2, 2003; (3) Final Assembly Floor Analysis, Analysis of Assembly Bill No. 60, as amended July 1, 1999; (4) Senate Appropriations Committee Fiscal Summary, Analysis of Assembly Bill No. 60, as amended June 24, 1999; (5) IWC wage order No. 9-98, effective January 1, 1998, through September 30, 2000; and (6) Senate Committee on the Judiciary, Analysis of Senate Bill No. 796 (2003–2004 Reg. Sess.) as amended April 22, 2003.

[30] As we discussed above, the IWC's intent in promulgating Wage Order No. 9, section 20, was to set forth the provisions of section 558. The only difference between the language of section 558 and Wage Order No. 9, section 20, is that Wage Order No. 9, section 20 refers to the recovery of *"unpaid* wages" while section 558 refers to the recovery of *"underpaid* wages." We view the terms "underpaid" and "unpaid" to be interchangeable, and note that the term "unpaid wages" as used in Wage Order No. 9, section 20, is linguistically correct because it refers to any amount or portion of wages that an employee should have been paid, but was not, whereas the term "underpaid wages," outside the context of section 558, would appear to refer

violation but, rather, is a remedy *in addition to* that civil penalty. Defendants contend that the plain language of section 558 and the PAGA supports their position.

We disagree that section 558 provides for a civil penalty of $50 or $100 only, and that it clearly excludes underpaid wages from the civil penalty. In our view, the language of section 558, subdivision (a), is more reasonably construed as providing a civil penalty that consists of *both* the $50 or $100 penalty amount *and* any underpaid wages, with the underpaid wages going entirely to the affected employee or employees as an express exception to the general rule that civil penalties recovered in a PAGA action are distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees (§ 2699, subd. (i)).

Our construction of section 558, subdivision (a), is in accord with the California Supreme Court's reading of that subdivision in *Reynolds v. Bement* (2005) 36 Cal.4th 1075 [32 Cal.Rptr.3d 483, 116 P.3d 1162] (*Reynolds*). The *Reynolds* court held that corporate agents such as officers and directors cannot be held liable as "employers" in an action under section 1194 for unpaid overtime wages. (*Reynolds, supra*, at pp. 1087–1088.) The *Reynolds* court rejected an argument by the Division of Labor Standards Enforcement (DLSE) that its holding would pose an obstacle to the Labor Commissioner's recovery of wages owed to California workers, noting that there were other means of seeking recovery against a corporate agent, and that "pursuant to section 558, subdivision (a), any 'person acting on behalf of an employer who violates, or causes to be violated' a statute or wage order relating to working hours is subject to *a civil penalty, payable to the affected employee, equal to the amount of any underpaid wages.*" (*Reynolds, supra*, at p. 1089, italics added, fn. omitted, disapproved on another point in *Martinez, supra*, 49 Cal.4th at pp. 50, fn. 12, 66.) In his concurring opinion in *Reynolds*, Justice Moreno similarly stated that the PAGA "in time, may provide workers with a mechanism for recovering unpaid overtime wages through private enforcement of section 558, *which authorizes civil penalties for violations of the wage laws that include unpaid wages* from '[a]ny employer or other person acting on behalf of an employer,' a phrase conceivably broad enough to include corporate officers and agents in some cases." (*Reynolds, supra*, at p. 1094 (conc. opn. of Moreno, J.).) These statements show that the Supreme Court viewed the recovery of underpaid wages under section 558, subdivision (a) as being part of, rather than in addition to, the civil penalty provided by that subdivision.

to the deficient amount that the employee was actually paid, rather than the amount by which he or she was underpaid, which is the amount that an employee could actually recover. In our discussion, we use the statutory term "underpaid."

In *Jones v. Gregory* (2006) 137 Cal.App.4th 798 [40 Cal.Rptr.3d 581] (*Jones*), an action by the DLSE against a corporate agent for unpaid wages, the appellate court contrasted section 210, which provides a civil penalty recoverable by the Labor Commissioner and payable in part to a fund dedicated to educating employers about state labor laws and in part to the state's General Fund, with section 558, stating: "Section 558, in sharp contrast to section 210, provides for penalties in 'an amount sufficient to recover underpaid wages,' which shall be 'paid to the affected employee.' " (*Jones, supra*, 137 Cal.App.4th at p. 809, fn. 11, abrogated on other grounds in *Martinez, supra*, 49 Cal.4th 35.) Thus, the *Jones* court, like the *Reynolds* court, viewed the recovery of underpaid wages under section 558 as part of the civil penalty provided by that statute.[31] In *Bradstreet v. Wong* (2008) 161 Cal.App.4th 1440 [75 Cal.Rptr.3d 253] (*Bradstreet*), the Court of Appeal noted the *Reynolds* majority's observation that "pursuant to section 558, subdivision (a), a person ' "acting on behalf of an employer" ' could be subject to *penalties equal to the amount of unpaid wages*, and that section 2699, subdivision (a) authorizes employees in some circumstance[s] to bring civil actions to collect these penalties." (*Bradstreet, supra*, 161 Cal.App.4th at p. 1451, italics added, abrogated on other grounds in *Martinez, supra*, 49 Cal.4th 35.)

Defendants cite *Beebe v. Mobility, Inc.* (S.D.Cal., Feb. 20, 2008, No. 07CV1766 BTM (NLS)) 2008 WL 474391 (*Beebe*) in which the federal district court, in an unpublished decision, concluded that the recovery of underpaid wages under section 558 "is not included in the penalty to be collected by the Labor Commissioner but rather constitutes wages which the Commissioner collects on behalf of previously underpaid employees," and that "the plain language of [section] 558 clearly indicates that the . . . underpaid wages [are not] a penalty which can be recovered by Plaintiff in lieu of the Labor Commissioner." However, the district court in *Yadira v. Fernandez* (N.D.Cal., June 14, 2011, No. C-08-05721 RMW) 2011 WL 2434043 (*Yadira*), declined to follow *Beebe* and held that an action to recover unpaid wages under section 558 was subject to a one-year statute of limitations applicable to the recovery of *penalties*. The *Yadira* court stated: "The *Reynolds* decision indicates that unpaid wages under [section] 558 are part of the civil penalty recoverable under PAGA. Because the California Supreme Court's interpretation of the California Labor Code is controlling, the court agrees with plaintiff that unpaid wages are part of [section] 558's civil penalty and are therefore recoverable under PAGA. . . . It does not

---

[31] The *Jones* court later noted Justice Moreno's observation in *Reynolds* that section 2699 " 'in time, may provide workers with a mechanism for recovering unpaid overtime wages through private enforcement of section 558, which authorizes civil penalties for violations of the wage laws that include unpaid wages . . . .' " (*Jones, supra*, 137 Cal.App.4th at p. 810, quoting *Reynolds, supra*, 36 Cal.4th at p. 1094 (conc. opn. of Moreno, J.).)

matter that [section] 558's penalty includes unpaid wages—both the statute and *Reynolds* define [section] 558's remedy as a penalty, which is the very reason that it is recoverable under PAGA."

We agree with the *Yadira* court that the entire remedy provided by section 558, including the recovery of underpaid wages, is a civil penalty, as noted by the California Supreme Court in *Reynolds* and by the Courts of Appeal in *Jones* and *Bradstreet*. Defendants characterize the statement in *Reynolds* that section 558 provides a "civil penalty, payable to the affected employee, equal to the amount of any underpaid wages" as dictum based solely on the text of section 558, without analysis. Even assuming that this is so, we conclude that it is a correct construction of section 558, subdivision (a), and note that statements of the California Supreme Court should be considered persuasive even if properly characterized as dictum. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [78 Cal.Rptr.2d 819]; *People ex rel. Totten v. Colonia Chiques* (2007) 156 Cal.App.4th 31, 39, fn. 6 [67 Cal.Rptr.3d 70]; *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 114 [113 Cal.Rptr.2d 915] ["[L]egal pronouncements by the Supreme Court are highly probative and, generally speaking, should be followed even if dictum."].) The *Reynolds* court's reading of section 558 reflects that the plain meaning of the statute is that the civil penalty it specifies consists of *both* an assessment of $50 for initial violations or $100 for subsequent violations *and* an amount sufficient to recover underpaid wages.

Defendants argue that *Arias* supports their construction of section 558, citing the *Arias* court's observation that if a plaintiff prevails in a PAGA action for civil penalties, nonparty employees may invoke collateral estoppel and use the judgment against the employer to obtain remedies other than civil penalties for the same Labor Code violations—one such remedy being the recovery of lost wages and work benefits under section 98.6, which prohibits retaliation against an employee for exercising rights protected by the Labor Code. According to defendants, this analysis in *Arias* makes it, "abundantly clear that a plaintiff may only bring a representative lawsuit for civil penalties under PAGA, and that the definition of civil penalties does *not* include restitution remedies such as one additional hour of pay or lost wages."[32]

Because an aggrieved employee who brings a PAGA action sues "as the proxy or agent of the state's labor law enforcement agencies" (*Arias, supra*, 46 Cal.4th at p. 986), the logical extension of defendants' argument that wages cannot be recovered as a civil penalty is that the LWDA could not seek

---

[32] *Arias* did not address the issue of whether recovery of underpaid wages under section 558 is part of the civil penalty prescribed by that statute or a remedy distinct from that civil penalty.

underpaid wages on behalf of employees under section 558. However, nothing in *Arias* suggests that the Legislature did not intend that the LWDA be able to recover "underpaid wages" on behalf of employees under section 558 as part of a civil penalty for Labor Code and IWC order violations that result in underpayment of wages. The Legislature has authorized labor law enforcement agencies to prosecute actions for wages on behalf of employees elsewhere in the Labor Code. For example, under section 1193.6, the Department of Industrial Relations or DLSE may prosecute a civil action to recover unpaid wages on behalf of employees, with or without their consent. We conclude that the Legislature similarly authorized the LWDA to recover underpaid wages on behalf employees in the form of a civil penalty under section 558. Accordingly, an aggrieved employee acting as the LWDA's proxy or agent by bringing a PAGA action may likewise recover underpaid wages as a civil penalty under section 558.

The trial court did not err in awarding underpaid wages as a part of the civil penalty provided by section 558, subdivision (a).

## II.

### *Exhaustion of Administrative Remedies*

Defendants contend that the trial court should not have awarded Thurman any relief under the PAGA because he failed to exhaust his administrative remedies before he was named as a plaintiff in the third amended complaint.

The PAGA "was amended shortly after its effective date, as of August 11, 2004, to, among other things, require exhaustion of administrative procedures before an action may be filed to allow the LWDA the initial opportunity to investigate and cite employers for Labor Code violations. According to its legislative history, the amendment was the 'result of an agreement reached between the [LWDA], business and labor representatives' and 'improves [the Act] by allowing the [LWDA] to act first on more "serious" violations such as wage and hour violations and give employers an opportunity to cure less serious violations.' (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 1809 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 5.)" (*Caliber Bodyworks, supra*, 134 Cal.App.4th at p. 375, fn. omitted.)

Section 2699.3, subdivision (a) sets forth the administrative procedures that an aggrieved employee must follow before bringing a PAGA action. The aggrieved employee must "give written notice of the alleged Labor Code violation to both the employer and the [LWDA], and the notice must describe facts and theories supporting the violation. [Citation.] If the agency notifies the employee and the employer that it does not intend to investigate . . . , or if

the agency fails to respond within 33 days, the employee may then bring a civil action against the employer. [Citation.] If the agency decides to investigate, it then has 120 days to do so. If the agency decides not to issue a citation, or does not issue a citation within 158 days after the postmark date of the employee's notice, the employee may commence a civil action." (*Arias, supra*, 46 Cal.4th at p. 981.)

Defendants contend that Thurman was required to comply with these administrative procedures because he was named as a plaintiff in the third amended complaint after the effective date of the amendment that added them to the PAGA.[33] Thurman argues that the administrative exhaustion requirements of section 2699.3 do not apply to him because this action was filed before section 2699.3 was enacted. We agree with Thurman.

A similar issue was presented in *Wright v. Morris* (6th Cir. 1997) 111 F.3d 414 (*Wright*), in which the federal court of appeals considered whether the administrative exhaustion requirement in the Prison Litigation Reform Act of 1995 (PLRA; Pub.L. No. 104-134 (Apr. 26, 1996) 110 Stat. 1321) applied to prisoner civil rights cases that were pending before the act took effect. The *Wright* court noted that the United States Supreme Court "has determined that, in deciding whether a new statute should be applied to pending cases, 'the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules.' " (*Wright, supra*, at p. 418, quoting *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 280 [128 L.Ed.2d 229, 114 S.Ct. 1483] (*Landgraf*); see *Oluwa v. Gomez* (9th Cir. 1998) 133 F.3d 1237, 1239 [If Congress has expressly described the statute's proper reach, "no further analysis is required and the court will 'simply apply the terms of the statute.' "].) Accordingly, the *Wright* court looked to the relevant statutory language for an expression that the PLRA should or should not apply to pending cases. (*Wright, supra*, at p. 418.)

The *Wright* court noted that "[t]he PLRA amended 42 [United States Code section] 1997e to read, 'no action *shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' " (*Wright, supra*, 111 F.3d at p. 418, italics added by *Wright*.) The *Wright* court concluded that by its use of the phrase "shall be brought," Congress had " 'expressly prescribed the statute's proper reach.' " (*Ibid.*, quoting *Landgraf, supra*, 511 U.S. at p. 280.) The *Wright* court held that "[t]he statute expressly

---

[33] As noted, the *Caliber Bodyworks* court held that an action seeking civil penalties for Labor Code violations is subject to the PAGA's prefiling notice and exhaustion requirements. (*Caliber Bodyworks, supra*, 134 Cal.App.4th at p. 378.)

governs the bringing of new actions, not the disposition of pending cases. Actions brought before the statute was enacted are not affected by the new administrative exhaustion requirement." (*Wright, supra*, at p. 418.)

 We adopt the analyses of the *Landgraf* and *Wright* courts for determining whether a new statutory administrative exhaustion requirement should be applied to pending cases. Accordingly, we conclude that if the Legislature has expressly prescribed the "proper reach" of a statute imposing an exhaustion requirement as governing the bringing of new actions, the language of the statute controls and no further analysis is required. The Legislature expressly prescribed the proper reach of section 2699.3 by providing that a civil action under the PAGA *"shall commence* only after [the specified administrative procedural] requirements have been met." (§ 2699.3, subd. (a), italics added.) By its express language, section 2699.3 governs only the *commencement* of actions under the PAGA, not the continuation of actions or the filing of amended complaints in actions that were pending before its effective date. As the *Caliber Bodyworks* court noted, section 2699.3 sets forth "administrative prerequisites to *filing* suit . . . ." (*Caliber Bodyworks, supra*, 134 Cal.App.4th at p. 382, italics added.) The instant action did not *commence* with the filing of the third amended complaint and the addition of Thurman as a plaintiff; rather, it commenced in January 2004 when the union filed the original complaint.[34] Thus, we conclude that this action is not affected by section 2699.3's new administrative exhaustion requirements, because section 2699.3 expressly governs the commencement of new actions and not the disposition of pending cases and this action was filed before section 2699.3 was enacted.

Defendants argue that the exhaustion requirements in section 2699.3 apply to Thurman's prosecution of the third amended complaint because they are *procedural* rather than *substantive* changes in the PAGA. Defendants cite *Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679 [10 Cal.Rptr.3d 702] (*Brenton*), in which this court noted that "[i]n contrast to changed substantive statutes, applying changed procedural statutes to the conduct of existing litigation, even though the litigation involves an underlying dispute that arose from conduct occurring before the effective date of the new statute, involves no improper retrospective application because the

---

[34] The filing of the third amended complaint, which added Thurman as a plaintiff, related back to the filing of the original complaint because both pleadings rested on the same general set of facts. (*Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 936–937 [136 Cal.Rptr. 269, 559 P.2d 624] [amended complaint relates back to the filing of the original complaint if the amended complaint rests on same general set of facts as the original complaint].)

statute addresses conduct in the future." (*Id.* at p. 689.)[35] However, as the United States Supreme Court stated in *Landgraf,* "the mere fact that a new rule is procedural does not mean that it applies to every pending case. *A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime . . . ."* (*Landgraf, supra,* 511 U.S. at p. 275, fn. 29, italics added.)[36] Because section 2669.3 imposed a new rule concerning the filing of complaints—i.e., the commencement of actions—it does not govern an action that was properly filed before its effective date.

Defendants also argue that the statutory repeal doctrine precludes Thurman from recovering civil penalties without having exhausted administrative remedies under section 2699.3. Under that doctrine, as articulated in *McCarthy v. Workers' Comp. Appeals Bd.* (2006) 135 Cal.App.4th 1230 [37 Cal.Rptr.3d 909] (*McCarthy*), " 'where a right or a right of action depending solely on statute is altered or repealed by the Legislature, in the absence of contrary intent, e.g., a savings clause, the new statute is applied even where the matter was pending prior to the enactment of the new statute.' " (*Id.* at p. 1236.)[37] Defendants essentially argue that because the enactment of section 2699.3 altered the purely statutory right to sue under the PAGA by requiring

---

[35] The *Brenton* court decided that Code of Civil Procedure section 425.17—which makes section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute, inapplicable to certain types of commercial speech—is a procedural statute that applied to actions pending at the time of its effective date. (*Brenton, supra,* 116 Cal.App.4th at pp. 689–690.)

[36] The *Wright* court concluded that even if the language of 42 United States Code section 1997e did not mandate that administrative exhaustion be required only in actions brought after the effective date of the PLRA, the above quoted language in *Landgraf* was controlling. (*Wright, supra,* 111 F.3d at pp. 418–419, 421.)

[37] *McCarthy* is the only California case that includes the word "altered" with the word "repealed" in explaining the statutory repeal doctrine, and it did so only in quoting the Workers' Compensation Appeals Board (WCAB) opinion in *Abney v. Aera Energy* (2004) 69 Cal.Comp.Cases 1552 (*Abney*) as follows: "*Abney* also properly relies on the statutory repeal rule, stating that '[i]t is well settled that where a right or a right of action depending solely on statute is *altered* or repealed by the Legislature, in the absence of contrary intent, e.g., a savings clause, the new statute is applied even where the matter was pending prior to the enactment of the new statute.' " (*McCarthy, supra,* 135 Cal.App.4th at p. 1236, italics added, quoting *Abney, supra,* at p. 1558.) *McCarthy* quoted *Abney* with approval, but did not specifically address the question of the applicability of the statutory repeal doctrine to the *alteration* of—in contrast with the *repeal* of—a right or right of action depending solely on statute. It is unclear why the WCAB used the word "altered," since none of the five cases that it cited as "see e.g." authority for its articulation of the statutory repeal doctrine uses that word or addresses the alteration, as opposed to the repeal, of a statutory right of action. (*Abney, supra,* 69 Cal.Comp.Cases at p. 1558, citing *Younger v. Superior Court* (1978) 21 Cal.3d 102, 109 [145 Cal.Rptr. 674, 577 P.2d 1014]; *Governing Board v. Mann* (1977) 18 Cal.3d 819, 829–830 [135 Cal.Rptr. 526, 558 P.2d 1]; *Southern Service Co., Ltd. v. Los Angeles* (1940) 15 Cal.2d 1, 11–12 [97 P.2d 963]; *Penzinger v. West American Finance Co.* (1937) 10 Cal.2d 160, 170–171 [74 P.2d 252]; *Callet v. Alioto* (1930) 210 Cal. 65, 67–68 [290 P. 438].) We question whether the statutory repeal doctrine is properly applied to the mere *alteration* of a right of action.

a PAGA plaintiff to first exhaust administrative remedies, under the statutory repeal doctrine the statute applies to all pending actions, including Thurman's.

 The statutory repeal doctrine is generally applied to *repeals*—i.e., when "the Legislature eliminates a statutory remedy" or "destroys" or " 'wipes out' " a right of action. (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1024 [35 Cal.Rptr.3d 487] (*Zipperer*).) In cases where the repeal is not express but rather, is the effect of new legislation, the pivotal issue in determining whether the legislation operates as a repeal is whether it "constitutes 'a substantial reversal of legislative policy' that represents 'the adoption of an entirely new philosophy' vis-à-vis the prior enactment." (*Id.* at p. 1025.) The legislation that enacted section 2699.3 did not constitute a substantial reversal of the legislative policy underlying the PAGA or the adoption of an entirely new philosophy. As noted, in enacting section 2699.3, the Legislature wanted merely to improve the PAGA " 'by allowing the [LWDA] to act first on more "serious" violations such as wage and hour violations and give employers an opportunity to cure less serious violations.' (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 1809 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 5.)" (*Caliber Bodyworks, supra,* 134 Cal.App.4th at p. 375.)

In any event, as we discussed above, section 2699.3 expressly changed the rules for *commencing* a PAGA action and thus, on its face, does not apply to actions that were pending at the time of its effective date. Accordingly, the only right of action that section 2699.3 "repealed" was the right to commence an action without satisfying the administrative procedural requirements of the statute. That statutory repeal does not affect the present action because the action was commenced prior to the effective date of section 2699.3.

III.

*Civil Penalties Under Section 558 for Missed Rest Periods*

Defendants contend that the trial court erred in allowing Thurman to recover PAGA penalties under section 558 for missed rest periods because, they maintain, that statute does not provide a penalty for missed rest periods. Section 558, subdivision (a) states, in relevant part: "Any employer or other person acting on behalf of an employer who violates, or causes to be violated, *a section of this chapter or any provision regulating hours and days of work in any order of the* [*IWC*] shall be subject to a civil penalty as follows . . . ." (Italics added.) Defendants note that chapter 1 of part 2 of division 2 of the Labor Code, consisting of sections 500 through 558, does not include a statute that requires an employer to provide rest periods for employees. They argue that a violation of Wage Order No. 9, section 12, which sets forth rest

period requirements, is not subject to a civil penalty under section 558 as an order "regulating hours and days of work" because the IWC uses the phrase "Hours and Days of Work" as the heading of Wage Order No. 9, section 3, which pertains only to overtime and alternative workweek schedules. Defendants contend that the phrase "Hours and Days of Work" is a term of art that is used to refer only to overtime and alternative workweek scheduling. Accordingly, defendants argue, the phrase "provision regulating hours and days of work" in section 558 refers only to provisions in Wage Order No. 9, section 3 and other IWC wage order sections entitled "Hours and Days of Work," and therefore, a violation of a provision in the separate wage order section governing rest periods is not subject to a civil penalty under section 558.

▮ Thurman argues, and we agree, that defendants attribute undue significance to the headings used in the IWC wage orders. "[S]tatutes governing conditions of employment are to be construed broadly in favor of protecting employees." (*Murphy, supra,* 40 Cal.4th at p. 1103.) The fact that the Legislature in section 516 authorized the IWC to "adopt or amend working condition orders with respect to break periods" is a strong indication that it intended that violations of such orders be subject to the civil penalty provided by section 558, which is in the same chapter as section 516.

▮ Moreover, the civil penalty under section 558 applies to "*any provision* regulating hours and days of work in *any order*" of the IWC. (Italics added.) This broad language further indicates that the Legislature did not intend to limit the application of the civil penalty under section 558 to provisions in IWC order sections entitled "Hours and Days of Work"; rather, the language suggests that the penalties were intended to apply to *any* provision in *any* order that regulates work hours.

Section 12(A) of Wage Order No. 9 states: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 ½) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages."

These are clearly provisions "regulating hours" under the plain meaning of that phrase as used in section 558. If the Legislature wanted to limit civil penalties under section 558 to IWC orders that regulate overtime pay and alternative workweek scheduling, it presumably would have expressly provided that the statute's civil penalty applies to a violation of any provision *regulating overtime pay and alternative workweek schedules* in any order of

the IWC. The trial court did not err in allowing Thurman to recover penalties under section 558 for missed rest periods.

## IV.

### *Judicial Admissions*

Defendants contend that the trial court erred in allowing Thurman to recover for missed meal periods after July 2003 because his complaint contains judicial admissions that defendants have provided meal periods, as required, since July 2003. We agree with defendants' contention.

The four verified complaints filed in this action, including the operative verified third amended complaint that added Thurman as a plaintiff, contained the following language regarding the recovery that plaintiffs sought against defendants for failure to provide meal periods: "The following formula was used in reducing the amounts owed by [NCT] because it has been providing meal periods since July 2003: [¶] 26 weekly pay periods [times] 1 hour of lost pay for each meal period not provided [times] $10.00 as the average hourly pay of employees represented by [the union times] 5 days in a typical work week [times] approximately 35 current [NCT employees]." Thus, Thurman not only admitted that defendants had been providing meal periods since July 2003, but he also set forth a mathematical formula for reducing his recovery demand to reflect that admitted fact.

In its statement of decision, the trial court ruled that Thurman was not bound by this admission, stating: "The court declines the invitation to elevate pleading form over the facts as they emerged at trial. To do so would give dignity to the 'gotcha' theory of litigation." The trial court found that although defendants had generally done a good job instituting split run shifts in July 2003 to provide the drivers meal periods in July 2003, they "failed to consider the realities of the NCT workplace when [they] designed splits of 30 and 33 minutes." The court stated that "defendants presumably knew this when they served their [Code of Civil Procedure] section 998 offer, and thus suffered no cognizable prejudice from the fact that plaintiff made an allegation that did not turn out to be true."[38] The court noted that Thurman "did not

---

[38] Code of Civil Procedure section 998, subdivision (c)(1) provides: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant."

allege that defendants were providing meal periods on all split runs as of July 2003; he merely alleged that defendants had been providing meal periods since July 2003 (which is true)." Regarding the formula proposed in the third amended complaint and earlier complaints to reduce meal period recovery based on defendants' having provided meal periods since July 2003, the trial court stated: "Both sides presented damage calculations at trial which were different from other calculations they had previously made . . . ."

■■■■ We conclude that the trial court erred in relieving Thurman from the effect of his judicial admission. In *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264 [127 Cal.Rptr.2d 436] (*Valerio*), the Court of Appeal concluded that the trial court erred in ignoring the respondent's judicial admission in his answer to the appellant's cross-complaint that a contract existed between the parties. (*Id.* at p. 1266.) The *Valerio* court noted that "[t]he admission of fact in a pleading is a 'judicial admission.' . . . 'An admission in the pleadings is not treated procedurally as evidence; i.e., the pleading need not (and should not) be offered in evidence, but may be commented on in argument and relied on as part of the case. And it is fundamentally different from evidence: It is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues. Under the doctrine of "conclusiveness of pleadings," a pleader is bound by well pleaded material allegations or by failure to deny well pleaded material allegations. [Citations.]' " (*Id.* at p. 1271, quoting 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 413, pp. 510–511.)

"Because an admission in the pleadings forbids the consideration of contrary evidence, any discussion of such evidence is irrelevant and immaterial. [Citation.] ' "When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as 'found.' . . . If the court does find adversely to the admission, such finding should be disregarded in determining the question whether the proper conclusion of law was drawn from the facts found and admitted by the pleadings. . . . In such case the facts alleged must be assumed to exist. Any finding adverse to the admitted facts drops from the record, and any legal conclusion which is not upheld by the admitted facts is erroneous." [Citations.]' " (*Valerio, supra,* 103 Cal.App.4th at p. 1271.) Thus, the trial court may not ignore a judicial admission in a pleading, but must conclusively deem it true as against the pleader. (*Dang v. Smith* (2010) 190 Cal.App.4th 646, 657 [118 Cal.Rptr.3d 490].)

The trial court reasoned that giving effect to Thurman's judicial admission would improperly "elevate pleading form over the facts as they emerged at trial." The *Valerio* court rejected similar reasoning by the respondent in that case, who argued that the trial court retained the inherent or equitable power to fashion a remedy that would avoid an unjust result and that the trial court

properly disregarded the judicial admission in light of other evidence presented at trial and his efforts to apprise the defendant of a change in case theory. (*Valerio, supra,* 103 Cal.App.4th at pp. 1271–1272.) Finding this argument to be without merit, the *Valerio* court stated: "An admission in a pleading is *conclusive on the pleader*. [Citation.] 'He cannot offer contrary evidence *unless permitted to amend*, and a judgment may rest in whole or in part upon the admission without proof of the fact.' [Citation.] While a court has inherent power to relieve a party from the effects of judicial admissions by amendment to the pleadings [citation], [the respondent] never sought to amend his answer to the cross-complaint." (*Id.* at p. 1272.)

The *Valerio* court viewed the respondent's failure to seek relief from his admission by requesting leave to amend as critical, even though it was apparent from the trial court's remarks that the court would have granted a motion to amend or withdraw. The *Valerio* court concluded: "While the result here is rigorous, the rule is clear and [the appellant] is entitled to rely upon it. To hold otherwise would undermine well-settled rules of pleading relied upon to properly structure litigation. [The respondent] failed to take the necessary procedural steps to remove his judicial admissions, even when [the appellant's] trial management conference statement and trial brief highlighted the issue. Contrary to the [trial] court's reasoning below, informal notification to the opposing party of a change in case theory does not obviate the conclusive effect of judicial admissions." (*Valerio, supra,* 103 Cal.App.4th at pp. 1273–1274.)

Similarly, in the present case Thurman failed to take the necessary procedural steps to obtain relief from judicial admissions even though defendants raised the issue in their motion in limine to exclude evidence of meal period violations after July 2003. In its opposition to the motion, the union indicated that it would move for leave to amend the third amended complaint to conform to proof, but never did so. Thurman argues that the court *effectively* granted a motion to amend the third amended complaint to conform to proof, even though he did not formally move to amend, by denying defendants' motion in limine[39] and by ultimately disregarding the judicial admissions. He notes that the union asserted in opposition to defendants' motion in limine that plaintiffs could amend the third amended complaint to conform to proof, to allege that defendants' meal period liability may have continued after July 2003. Thurman cites this court's decision in *Stoner v. Williams* (1996) 46 Cal.App.4th 986, 1005 [54 Cal.Rptr.2d 243]

---

[39] The trial court denied the motion in limine because it concluded that "only by hearing the evidence" could it determine whether defendants would actually be prejudiced by relieving Thurman from the effects of the judicial admission and allowing him to seek recovery for missed meal periods after July 2003.

(*Stoner*) for the proposition that a party need not make a formal motion, and the court need not issue a formal order, to effect an amendment to conform to proof.

*Stoner* is inapposite for several reasons, the principal one being that it did not involve a judicial admission. The *Stoner* court rejected the appellant/defendant's contention that the trial court's allowing the jury to consider expert testimony supporting a fraud claim based on *nondisclosure* was an abuse of discretion because the fraud cause of action in the plaintiff's complaint alleged only *misrepresentations*. (*Stoner, supra,* 46 Cal.App.4th at pp. 1004–1005.) The *Stoner* court concluded that the expert testimony did not vary from the allegations in the complaint to such an extent that the defendant was misled, noting that although fraud generally must be specifically pleaded, "as pretrial discovery and revelations during trial give rise to new factual allegations which are not materially different from those contained in the complaint, a court has the discretion to allow the additional evidence . . . ." (*Id.* at p. 1005.) The *Stoner* court further noted that the challenged testimony was closely related to the fraudulent acts that were alleged in the complaint. (*Ibid.*) Thus, *Stoner* did not involve the issue of whether and when a trial court may properly grant (expressly or impliedly) leave to amend to conform to proof to relieve a pleader of the effects of a judicial admission, despite the general rule that a judicial admission is conclusive against the pleader.

Second, unlike the defendant in *Stoner*, who was not prejudicially misled by testimony that varied from the allegations in the complaint, the record here shows that defendants prejudicially relied on Thurman's judicial admissions that they had provided meal periods since July 2003. Defendants' counsel filed a posttrial declaration stating that defendants served a statutory offer to compromise under Code of Civil Procedure section 998 on plaintiffs, and that plaintiffs rejected the offer. The declaration averred that in determining the dollar amount of the statutory offer, counsel and defendants relied on plaintiffs' admission that defendants had no liability for missed meal periods after July 2003, and that if the trial court were to allow Thurman to avoid the judicial admissions, defendants would "suffer severe prejudice, as this may allow [Thurman] to recover damages in excess of the statutory offer, and undermine the important reasons for making the statutory offer."

Third, the *Stoner* court noted that the defendant in that case "did not object to any supposed lack of compliance with *technical pleading rules* . . . ." (*Stoner, supra,* 46 Cal.App.4th at p. 1006, italics added.) Here defendants clearly objected before, during, and after trial, to the admission of evidence of missed meal periods after July 2003, and their objection was not based on "technical pleading rules," but on the ground it would violate the *well-settled*

*rule* that a judicial admission is conclusive against the pleader and precludes the consideration of contrary evidence. (*Valerio, supra,* 103 Cal.App.4th at pp. 1271–1272.) We are not persuaded by *Stoner* to conclude that the trial court effectively granted an implied motion to amend the third amended complaint to conform to proof.

 Even when a party affirmatively seeks relief from an admission by formally requesting leave to amend, the trial court's discretion to grant such relief is substantially limited. The California Supreme Court held that " '[a]s a general rule a party will not be allowed to file an amendment contradicting an admission made in his original pleadings. If it be proper in any case, it must be upon *very satisfactory evidence that the party has been deceived or misled, or that his pleading was put in under a clear mistake as to the facts.*' " (*Brown v. Aguilar* (1927) 202 Cal. 143, 149 [259 P. 735], italics added.) Putting aside the fact that Thurman never sought relief from his judicial admission by requesting leave to amend, he does not argue that his admission was the result of his or his former coplaintiffs' having been deceived, misled, or clearly mistaken as to the facts.

The trial court's conclusion that the admission did not preclude recovery for missed meal periods after July 2003 because it was not an admission that defendants provided meal periods on *all* split runs as of July 2003 reflects an unreasonably hyper-technical reading of the admission. Defendants reasonably viewed the admission that defendants had been providing meal periods since July 2003, together with the formula that plaintiffs provided for reducing the missed meal period recovery for all of the employees on whose behalf Thurman sought civil penalties under the PAGA, as an admission that defendants had been in compliance with the law pertaining to meal periods since July 2003, and therefore, that any PAGA liability for missed meal periods ended as of that time. The trial court should have given effect to the judicial admission in determining the amount of civil penalties to award under the PAGA for missed meal periods and the amount of Thurman's restitutionary recovery under the UCL.

## DISPOSITION

The portions of the judgment awarding civil penalties, prejudgment interest, and restitution for missed meal periods are reversed. The matter is remanded with directions to determine the amount of civil penalties for missed meal periods from January 1, 2002, to July 2003, and the amount of restitution and prejudgment interest attributable to missed meal periods during that time period, and to amend the judgment by awarding those amounts in addition to the civil penalties, restitution, and prejudgment interest awarded for missed rest periods. The trial court is further directed to

determine whether the amount of the amended judgment is less than defendants' offer to compromise under Code of Civil Procedure section 998 and to reconsider any award of costs and attorney fees that it may have made based on that offer. The judgment is otherwise affirmed. The parties shall bear their own costs on appeal.

Haller, Acting P. J., and McDonald, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied June 13, 2012, S201442.